NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0371n.06
Filed: May 10, 2005

Nos. 03-1385; 03-1395

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| FRAZIER INDUSTRIES, L.L.C., | ) | |
| *Plaintiff-Appellant and* | ) | |
| *Cross-Appellee*, | ) | |
| | ) | On Appeal from the United |
| v. | ) | States District Court for the |
| | ) | Eastern District of Michigan |
| GENERAL FASTENERS COMPANY, *et al.*, | ) | |
| *Defendants-Appellees and* | ) | |
| *Cross-Appellants.* | ) | |

_____/

Before: CLAY and GILMAN, Circuit Judges; and O'MALLEY, District Judge.[*]

*O'MALLEY, J.* This action turns on whether a "Letter of Intent" between the Plaintiff Frazier

Industries, L.L.C. ("Frazier Industries"), and the Defendants David Grossman ("Grossman") and

General Fasteners Company ("GFC"), formed an enforceable contract under Michigan law, and, if

so, whether Grossman and GFC breached that contract.[1] Finding that the contract contained no

"mutual obligations" and lacked essential terms – and that a "Break-Up Fee" provision in the letter

---

[*] The Honorable Kathleen O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

[1] This opinion refers to the individual Defendants, David Grossman and General Fasteners Company, when its discussion pertains only to the specific individual or entity. Otherwise, the term "Defendants" refers to both GFC and David Grossman, GFC's owner and president. In many instances, a distinction between the two is not necessary so the Court refers to them collectively. The terms "plaintiff" and "defendant," when used, are in lieu of the normal monikers used by this Court (i.e., Appellant and Appellee) so as to avoid confusion in light of the fact that we address cross-appeals in this opinion.

agreement was unenforceable as a penalty – the district court granted the Defendants' motion for summary judgment, and denied Frazier Industries' motion for summary judgment. Based on its ruling, the district court also dismissed the Defendants' counterclaim. Two appeals followed.

In Case No. 03-1385, Frazier Industries appeals the grant of Defendants' motion for summary judgment.[2] In Case No. 03-1395, Defendants cross-appeal the dismissal of their counterclaim, which alleged that Frazier Industries committed, among other things, fraud-in-the-inducement. Defendants concede that their cross-appeal is unnecessary if this Court affirms the district court's grant of summary judgment in their favor.

For the reasons set forth more fully below, the district court's order granting the Defendants' motion for summary judgment is **AFFIRMED**. The district court's dismissal of Defendants' counterclaim is, therefore, also **AFFIRMED**.

## SUMMARY AND PROCEDURAL BACKGROUND

On September 8, 2001, Frazier Industries entered into a "Letter of Intent" agreement ("Agreement") with Grossman and GFC. The Agreement provided that the parties would negotiate in good faith toward a final "Definitive Agreement," whereby Frazier Industries would make a capital contribution to GFC and receive in exchange 65% of GFC's shares. This arrangement was made in an effort to prevent an impending liquidation threat faced by GFC from its primary creditor, Bank One Corporation ("Bank One"). The Agreement contained a 45-day Due Diligence provision, during which the parties agreed to continue negotiations toward a Definitive Agreement and to provide Frazier Industries with an opportunity to inspect GFC's books and records. Frazier

---

[2]     Frazier Industries does not appeal the district court's *denial* of its motion for summary judgment. It only appeals the *grant* of Defendants' motion for summary judgment.

2

Industries' obligation to enter into a Definitive Agreement was expressly conditioned on its approval of GFC's operational condition during the Due Diligence Period.

On or about December 7, 2001, Defendants informed Frazier Industries that it was no longer interested in pursuing the Definitive Agreement. On January 8, 2002, Frazier Industries filed this diversity action in the United States District Court for the Eastern District of Michigan, alleging that Defendants' actions constituted an actionable breach of contract. Following extensive discovery, the parties filed cross-motions for summary judgment. Frazier Industries argued that the Defendants had breached the terms of the Agreement, and that it was entitled to $475,000 pursuant to a "Break-Up Fee" provision in the Agreement. Defendants argued that the Agreement was not an enforceable contract because it lacked mutuality of obligations and consideration, omitted material terms, included an unenforceable penalty clause, and remained an executory agreement on which Frazier Industries had not begun performance. Alternatively, Defendants filed a counterclaim alleging that, even if the parties had formed a contract, Frazier Industries committed fraud-in-the-inducement by affirmatively misrepresenting the terms of the Agreement.

On February 24, 2003, the district court heard oral arguments on the summary judgment motions. On February 28, 2003, the court granted Defendants' motion, and denied Frazier Industries' motion. The court also dismissed Defendants' counterclaim. On March 14, 2003, Frazier Industries filed a Motion for Reconsideration pursuant to Federal Rule of Civil Procedure 59(e), which the court denied as repetitive of Frazier Industries' original arguments. In its written order on Frazier Industries' Motion for Reconsideration, the district court reaffirmed its conclusion that no enforceable agreement existed between the parties. Significantly, the district court also found, in the alternative, that any enforceable obligation on the part of the Defendants to continue

3

negotiations with Frazier Industries expired no later than 45 days after September 8, 2001, or as of October 23, 2001. Based on this conclusion, the court found that, to the extent the Agreement constituted an enforceable contract, it had not been breached by the Defendants.

On March 18, 2003, Frazier Industries filed a timely notice of appeal, seeking reversal of the district court's order granting Defendants' motion for summary judgment. With their response, Defendants filed a cross-appeal seeking reversal of the district court's dismissal of their counterclaim. Defendants argue that, if this Court reverses the district court's grant of summary judgment in its favor, it should likewise reverse the district court's dismissal of their counterclaim.

## FACTUAL BACKGROUND

GFC is a Michigan corporation. It is a manufacturer and distributor of automotive and other metal fasteners. GFC is owned by its President, David Grossman, who operates GFC with his sister. Early in the spring of 2001, GFC's primary creditor, Bank One, threatened to call in approximately $26 million in outstanding GFC loans. Defendants were unable to pay the outstanding debts because of a revenue shortage brought on by an unexpected loss of several key customers. Bank One's threat, if acted upon, would have forced GFC to liquidate its assets.

Defendants sought to refinance the Bank One debt by commissioning the services of Plante & Moran Corporate Finance ("Plante & Moran"). By April 2001, Plante & Moran began working on a refinancing plan for GFC. Despite working throughout the summer of 2001, Plante & Moran was unable to find a lender who would participate in a refinancing plan. Before long, and as a prelude to liquidation, Bank One demanded that GFC engage an appraiser to value GFC's assets.

Grossman described GFC's financial situation, as of July 2001, as "desperate." He considered selling one of GFC's facilities – the Eckles Road facility – in an effort to relieve some

4

of the company's financial problems. Zachary Savas ("Savas"), then a financial consultant at the investment firm of Crambrook Partners, L.L.P. ("Crambrook Partners"), was one of the people Grossman approached to assist in the sale of the Eckles Road facility. Savas expressed interest in the Eckles Road opportunity, and, upon learning of GFC's widespread financial difficulties, also expressed interest in all of GFC's assets. Prior to meeting Grossman, Savas and Roderick Frazier ("Frazier"), then a Senior Vice President of Fifth Third Bank, had formed a company specializing in acquiring and/or assisting financially distressed companies. The name of their company was Frazier Industries, L.L.C. ("Frazier Industries"), the Plaintiff-Appellant in this appeal.

Frazier Industries, an Illinois corporation, is a holding/operations company that arranges and structures capital for the acquisition of privately-owned companies, including poorly performing companies, that are in need of refinancing. After several discussions with Frazier and Savas, Grossman agreed to their strategy to "save" GFC from the impending Bank One liquidation. According to Frazier's affidavit, the strategy included: 1) shifting control of GFC to Frazier Industries; 2) recapitalization of GFC based on a plan devised by Frazier Industries; 3) implementation of operational improvements at GFC's operational site; and 4) Frazier Industries' assistance in obtaining refinancing for GFC's Bank One debt.

The parties' early discussions culminated in the Agreement, a letter that was drafted by Frazier Industries' counsel, and executed by the parties on September 8, 2001. The Agreement has two distinct parts. Part One sets forth the parties' intent to negotiate toward a recapitalization of GFC and ultimate transfer of a controlling share of GFC stock to Frazier Industries. By its own terms, Part One was not intended to be legally binding on either party if their negotiations were unsuccessful. Part Two is the self-described "legally binding and enforceable agreement of the

5

parties." The critical aspects of this portion of the Agreement are an exclusive dealing provision and a "Break-Up Fee" provision. Part Two also contains certain miscellaneous provisions, including confidentiality and termination provisions.

Certain specific provisions of the Agreement are central both to the district court's conclusions and to ours. The Agreement states that it "intend[s] to summarize the principal terms of a proposal being considered by Frazier Industries . . . regarding possible investment in [GFC]." It specifically recites that the "exact form and structure of the contemplated recapitalization is subject to finalization by the parties." Therefore, as noted, the Agreement is separated into two parts.

More specifically, Part One outlines the basic terms of the contemplated transaction – i.e., recapitalization contribution amounts by both Frazier Industries and Grossman, in contemplated proportions (57% and 43% respectively), in return for a transfer of 65% of the outstanding voting capital stock to Frazier Industries. Part One then contains the following critical provisions:

3.      DEFINITIVE AGREEMENT

The Parties will negotiate in good faith towards a Definitive Agreement. There will be no obligation to negotiate beyond the end of the Due Diligence Period. Any Definitive Agreement will contain representations, warranties, indemnities and agreement by [GFC] and Grossman as are customary in transactions of this type.

4.      DUE DILIGENCE

For a period of 45 days after execution of this Letter Agreement by all Parties (the "Due Diligence Period"), Frazier [Industries] shall have the right to investigate (and copy) all of the books and records of [GFC], as well as all assets, physical plants, contracts, receivables, tax returns, financial statements, and other matters which Frazier [Industries] deems advisable or appropriate to review in connection with the Transaction. Frazier [Industries] may conduct its due diligence on its own, or though professionals hired by Frazier [Industries] (including accountants, lawyers, financial advisors and other professionals). [GFC] and Grossman agree to cooperate fully with Frazier [Industries] in the completion of its due diligence investigations.

6

Frazier [Industries'] obligation to complete the Transaction contemplated hereby is subject in all events to its approval of the condition of [GFC] during the Due Diligence Period.

Finally, as to Part One, the last numbered paragraph of the Agreement (paragraph 6 of Part Two) recites that "[t]he paragraphs and provisions of Part One of this letter do not constitute and will not give rise to any legally binding obligation on the part of any of the Parties or [GFC]."

Part Two of the Agreement contains provisions which are characterized as the "legally binding and enforceable agreement of the Parties." It provides that, in return for the "time," "effort" and "expense" Frazier Industries anticipates it will incur in "evaluating the Transaction," GFC and Grossman will: 1) provide free access to all aspects of GFC's business (books, records, personnel, customers, etc.) during the Due Diligence Period; 2) refrain from "solicit[ing] or entertain[ing] offers, negotiat[ing] with or . . . consider[ing] any proposal" from any other sources relating to the sale, recapitalization or restructuring of [GFC] during the Due Diligence Period; and 3) conduct GFC's business "in the ordinary course and refrain from any extraordinary transactions" during the Due Diligence Period.

Part Two also contains a "Break-Up Fee" provision – the provision that Frazier Industries seeks to enforce in this action. That provision reads as follows:

[Defendants] hereby jointly and severally agree that it [sic] will pay to Frazier [Industries] a fee of $475,000 if any of the following shall occur:

(a)     [Defendants] breach Part Two Paragraph 2 [Exclusive Dealings] or interferes with [Frazier Industries'] rights in Part One Paragraph 4 [Due Diligence] of this Letter; or

(b)     [Defendants]: (i) terminate[] negotiations toward a Definitive Agreement or breach[] the executed Definitive Agreement and fail[] to close the Transaction, and (ii) within one year after the date of such termination, either [Defendants] enter[] into (or sign[] a letter of intent to enter into) a transaction substantially similar to the Transaction contemplated hereby. The Parties agree that any recapitalization or issuance of

7

shares by [GFC] (regardless of the amount or structure) shall be a transaction that is substantially similar to the Transaction contemplated hereby;

. . .

(d) [Defendants]: (I) terminate[] negotiations toward a Definitive Agreement or breach[] the executed Definitive Agreement and fail[] to close the Transaction, and (ii) within one year after the date of such termination, [Defendants] refinance [their] existing secured indebtedness substantially similar to or based upon proposals or contracts formulated or initiated by [Frazier Industries] in the course of this transaction.

In other words, the "Break-Up Fee" would be triggered if the Defendants 1) failed to provide full access to GFC during the Due Diligence Period, 2) violated their obligation to deal only with Frazier during the Due Diligence Period, or 3) "terminated negotiations toward a Definitive Agreement" with Frazier Industries and engaged in an alternative refinancing plan with another party within one year of such termination.

Finally, Part Two contains a confidentiality provision. Pursuant to this provision, both parties agreed to maintain the confidentiality of all business and financial data of the other exchanged during the parties negotiations or learned through due diligence.

Consistent with the parties' expressed intention in the Agreement, by early September 2001, efforts to obtain refinancing for GFC began in earnest. By then, GFC and Grossman had convinced Bank One to forebear on its threat of liquidation. Bank One's new deadline for repayment or restructuring of GFC's loan was December 1, 2001.[3] Sometime in September 2001, Frazier had resigned his position as Senior Vice President of Fifth Third Bank so as to commit fully to Frazier Industries and the GFC project. Frazier and Savas conducted significant due diligence to learn about

---

[3] It is unclear whether Frazier industries assisted in obtaining this forbearance. It is clear, however, that the parties were aware of the new deadline throughout the Due Diligence Period.

8

GFC's business and GFC cooperated in those efforts, providing free access to all aspects of its business. Frazier and Savas attended management meetings and, with Defendants' approval, made presentations to potential lending sources. Ultimately, Frazier Industries presented a proposal to Bank One, which Grossman endorsed. The proposal included a detailed financing plan providing that, among other things: (1) Bank One would lend approximately $4 million to GFC; (2) Frazier Industries and Grossman would make preferred equity contributions to GFC; and (3) GFC's outstanding Bank One loan would be repaid by a newly proposed date certain.

Barry Rourke ("Rourke"), a Bank One First Vice President, rejected the proposal, however, because, among other reasons, he believed it contained too many financial contingencies. Based on communications with Rourke during September, October, and November 2001, Frazier Industries finalized a *revised* proposal on December 7, 2001, six days *after* Bank One's December 1, 2001 forbearance deadline. The revised proposal was not endorsed by Grossman, who refused to sign it, or even provide comments on it, when it was submitted to him in early December. While the parties debate whether the proposal was ever submitted to Bank One, it is clear that Bank One never acted on the revised proposal.

On December 10, 2001, Grossman informed Savas that GFC intended to replace Frazier Industries with another party who would suggest an entirely different form of restructuring to Bank One. On December 12, 2001, Frazier Industries sent a fax to Grossman stating that the Defendants' failure to contact Frazier Industries by December 13, 2001 in order to continue negotiations toward a Definitive Agreement would result in a "termination of negotiations" within the meaning of the Agreement. In Frazier Industries' view, any such termination would give rise to payment obligations under the Agreement's "Break-Up Fee" provision.

9

On December 27, 2001, Grossman entered into a new agreement to sell control of GFC to MNP Corporation ("MNP"), a principal supplier and joint business partner of GFC. Frazier Industries argues that the arrangement between GFC and MNP was "nearly identical" to GFC's agreement with Frazier Industries, thereby triggering the Agreement's "Break-Up Fee" provision because the new deal with MNP occurred within one year of the Defendants' termination of negotiations with Frazier Industries. On January 4, 2002, GFC and MNP entered a formal agreement that gave MNP principals a majority interest in GFC's assets. The new agreement was amenable to Bank One and Congress Financial Corporation ("Congress"), GFC's new lending source.

Soon after Defendants entered into their new financing arrangement, Frazier Industries demanded that Defendants pay the $475,000 "Break-Up Fee." Defendants refused. That refusal resulted in this case, in which Frazier Industries alleges a breach of the Agreement and seeks an order requiring specific performance by the Defendants of the "Break-Up Fee" provision. Defendants filed a counterclaim alleging a breach of contract or, alternatively, fraudulent inducement. Following discovery, both parties filed motions for summary judgment. The district court granted Defendants' motion for summary judgment and found that: 1) no enforceable contract existed, or, alternatively, if a contract did exist, it had not been breached; and 2) the $475,000 "Break-Up Fee" amounted to an unenforceable penalty. For the same reasons, the district court denied Frazier Industries' cross-motion for summary judgment. The court also dismissed Defendants' counterclaim. It is from the district court's grant of Defendants' motion for summary judgment that Frazier Industries appeals; and it is from the district court's dismissal of Defendants' counterclaim that Defendants cross-appeal.

## DISCUSSION

Though the parties' briefs detail a litany of questions presented for review, given this Court's ultimate conclusion, resolution of the following questions disposes of these appeals: *Did the parties form an enforceable contract under Michigan law; and, if so, was that contract breached?* The secondary issue – *whether the $475,000 "Break-Up Fee" is unenforceable* – arises only if a contract existed, and it was breached. As outlined more fully below, this Court's determination that an enforceable contract was created, but not breached, renders an analysis of the validity of the "Break-Up Fee" provision unnecessary.

### *Standard of Review*.

This Court reviews a district court's grant of summary judgment *de novo*. *See Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004); *Rowan v. Lockheed Martin Energy Systems, Inc.,* 360 F.3d 544, 547 (6th Cir. 2004). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In evaluating a motion for summary judgment, this Court must view the evidence, and draw all reasonable inferences, in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). Because this case is in federal court on diversity jurisdiction, this Court must apply the forum state's law in accordance with the relevant pronouncements of the state's highest court. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 76-79 (1938); *AllState Ins. Co. v. Thrifty Rent-A-Car Sys.*, *Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citing *Kingsley*

11

*Assoc., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir 1995)). If the state's highest court has not addressed a given issue, then a federal court may consider decisions from the state appellate courts, but only to the extent those decisions reflect the likely outcome were the state's highest court to decide the issue. *See Allstate Ins. Co.*, 249 F.3d at 454. The parties agree that Michigan law governs this case.

### The Parties Entered Into An Enforceable Contract Under Michigan Law.

Frazier Industries asserts that a contract existed between the parties and that the district court erroneously granted Defendants' motion for summary judgment. It argues that the court erred when it found that the Agreement lacked mutual consideration and necessary material terms. Finally, it argues that the court erroneously determined that the Agreement's $475,000 "Break-Up Fee" was unreasonably high and/or amounted to an unenforceable liquidated damages provision. More specifically, Frazier Industries contends that the district court 1) errantly construed *arguably* ambiguous portions of the Agreement against it; 2) ignored definitive obligations Frazier Industries undertook pursuant to the Agreement; and 3) failed to recognized that, regardless of whether mutuality of consideration existed, the Agreement was enforceable as a unilateral contract. Defendants disagree with each of these contentions, and argue that the district court correctly found that no contract existed between the parties. Alternatively, Defendants argue that, even if a contract did exist, it existed for a limited period of time, during which the parties agree that no breach occurred. As Defendants note, while not the primary grounds for the order we review, the district judge expressed an alternative holding – that the Agreement had a 45 day duration and that no "termination of negotiations" occurred during that time frame.

Formation of an enforceable contract under Michigan law requires: (1) competent parties;

12

(2) legal consideration; (3) mutuality of agreement; and (4) mutuality of obligation. *See Tata Consultancy Servs. v. Sys. Int'l, Inc.*, 31 F.3d 416, 428 (6th Cir. 1994) (applying Michigan contract principles); 17 C.J.S. *Contracts* § 2 (2003). Over the years, the "mutuality of obligation" element in contract formation theory has been eliminated by the logical recognition that not all contracts require that element to be valid. *See Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W. 2d 880, 885 (Mich. 1980) ("The enforceability of a contract depends . . . on consideration and not mutuality of obligation."); 17A AM. JUR.2D. § 24 (2004) ("the doctrine of mutuality is inapplicable to unilateral contracts").

Consideration requires bargained-for legal detriment. *Higgins v. Monroe Evening News*, 272 N.W.2d 537, 540 (Mich. 1978); *Harris v. Chain Store Realty Bond & Mortgage Corp.*, 45 N.W.2d 5, 8 (Mich. 1950); *Plastray Corp. v. Cole*, 37 N.W.2d 162, 165 (Mich. 1949) (defining consideration as "a benefit on one side, or a detriment suffered, or service done on the other") (quotations omitted). Michigan abides by the common law principle that sufficiency of consideration does not matter in determining the validity of an agreement. *See Gen. Motors Corp. v. Dep't of Treasury, Revenue Div.*, 644 N.W.2d 734, 738 (Mich. 2002) ("a cent or a pepper corn, in legal estimation, would constitute valuable consideration") (quotations omitted). Thus, regardless of whether an agreement is bilateral or unilateral, there must be valid legal consideration for a contract to result. *See id.*

A contract to make a future contract is not *per se* unenforceable, and may be as valid as any other contract so long as material terms of the future agreement are included. *See Opdyke Inv. Co. v. Norris Grain Co.*, 320 N.W.2d 836, 838 (Mich. 1982); *Socony-Vacuum Oil Co. v. Waldo*, 286 N.W. 630, 632 (Mich. 1939); *Zander v. Ogihara Corp.*, 540 N.W.2d 702, 705 (Mich. Ct. App. 1995)

13

(noting that a letter of intent purporting to form a future contract may be enforced as a contract if material terms of the future agreement are delineated in the letter and the letter otherwise satisfies the elements for contract formation under Michigan law). Further, in determining whether an agreement constitutes an enforceable contract, courts must determine the parties' intent as delineated in their agreement. *See Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 455 (6th Cir. 2003) (applying Michigan law). It is further settled that "[a] promise which is made conditional on the will of the promisor is generally of no value, for one who promises to do a thing only if it pleases him to do it is not bound to perform it at all." *Carlson v. Johnson*, 265 N.W. 517, 517 (Mich. 1936); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 77, Comment A (1981) ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise . . . . Where the apparent assurance of performance is illusory, it is not consideration for a return promise") (hereinafter "RESTATEMENT").

In concluding that no contract existed, the district court pointed out that the Agreement had been divided into Parts One and Two, as detailed above. The court then noted that virtually all of Frazier Industries' undertakings were described in Part One, the non-legally binding section, while GFC was obligated to perform a number of acts in Part Two, the legally-binding provisions of the Agreement. The court said that Frazier Industries' attempt to bind the Defendants in the Agreement "while explicitly exempting itself from any legal obligation . . . was the contractual equivalent of trying to 'have its cake and eat it too'." In light of this structure, the court found that the Agreement lacked mutuality of obligations and was, thus, unenforceable in its entirety.

The district court bolstered its conclusion that no contract existed, moreover, by pointing out that the only reference to any obligation undertaken by Frazier Industries appearing in Part Two was

14

a vague reference to the "time," "effort," and "expense" necessary for Frazier Industries to "evaluate the Transaction." Because this reference lacked precision, the district court found that the Agreement lacked the material terms necessary to create an enforceable agreement.[4]

We decline to parse the parties' Agreement as narrowly as did the district court. While it is true that the Agreement declares Part One to be "non-binding," there are definitions and undertakings set forth in Part One that are referenced and, in fact, incorporated into in Part Two. Thus, the provisions of Part One are necessary to an understanding of the undertaking set forth in Part Two. We believe that the Agreement must be considered in its entirety and that, when it is, it is apparent that the parties entered into a legally binding contract, with mutual obligations and consideration.

As noted, GFC and Grossman agreed to: 1) bargain in good faith with an eye toward reaching a Definitive Agreement; 2) provide Frazier Industries with access to GFC during the Due Diligence Period; 3) refrain from dealing with other suitors during the Due Diligence Period; and 4) maintain the confidentiality of all business and financial information received from Frazier Industries during the parties negotiations. In return, Frazier Industries agreed to: 1) negotiate in good faith toward a Definitive Agreement; 2) expend "time," "effort," and "expense" to evaluate the Transaction – which is defined as the "recapitalization" (i.e., the capital contribution, refinancing and stock transfers) contemplated by the Agreement; 3) conduct due diligence of GFC during the Due Diligence Period; and 4) maintain the confidentiality of the information received from GFC during negotiations and its due diligence.

---

[4] Specifically, the court noted that, while there were references to "time" and "effort" in the preamble to Part Two, there is no explanation of the amounts of either, or even to the nature of the effort contemplated.

15

We find that these bargained-for promises were sufficient consideration for the creation of a bilateral contract between the parties. *See Gen. Motors Corp.*, 664 N.W.2d at 738; *Higgins*, 272 N.W.2d at 540; *Harris*, 45 N.W.2d at 8; *see also* RESTATEMENT, § 71, cmt. b, illustration ("Even where both parties know that a transaction is in part a bargain and in part a gift, the element of bargain may nevertheless furnish consideration for the entire transaction.").[5]

We find, moreover, that the Agreement does not fail for indefiniteness. While it is true that many material terms of the Definitive Agreement were unstated in the Agreement, the mutual promises described above were both sufficiently material and sufficiently specific to constitute definite obligations and understandings between the parties. *See, e.g., Milner Hotels, Inc. v. Ehrman*, 11 N.W.2d 914, 917-18 (Mich. 1943) (finding that consideration is a material term in a contract); *Brin v. Michalski*, 154 N.W. 110, 112 (Mich. 1915) (same); *Zurcher v. Herveat*, 605 N.W.2d 329, 343 (Mich. Ct. App. 1999) (same). Thus, for purposes of a definiteness analysis, we find that the question is <u>not</u> whether the parties entered into a binding recapitalization transaction (i.e., a Definitive Agreement), but whether the parties entered into a binding agreement to negotiate in good faith toward such a transaction, and to take certain actions, or forebear from certain actions, while those negotiations were ongoing. We find that they did.

***Defendants Did Not Breach The Contract Between The Parties***.

---

[5]  Frazier Industries' alternative argument that the parties formed a unilateral contract is without merit. Though GFC's express obligations under the contract may have been more extensive than those of Frazier Industries, the obligations were clearly mutual. Indeed, this is apparent from the manner in which the parties carried out their respective obligations, with Frazier Industries indeed expending time and effort to examine GFC's financial status and exploring ways to restructure it, and the Defendants cooperating in those efforts during the Due Diligence Period.

16

While we disagree with the district court's conclusions as to the existence of an enforceable agreement, we agree with the court's alternative conclusion that the Defendants did not breach any of their obligations under the Agreement.[6] And, we agree, accordingly, that Frazier Industries is not entitled to the $475,000 "Break-Up Fee" described in the Agreement.

As noted, the "Break-Up Fee" kicks in only upon the occurrence of specified events. Frazier Industries does not argue, and conceded at oral argument that it has no basis to argue, that the Defendants either breached the Exclusive Dealing provision in Paragraph 2 of Part Two of the Agreement, or interfered with Frazier Industries' ability to conduct due diligence to the extent authorized under Paragraph 4 of Part One of the Agreement.[7]

Instead, Frazier Industries argues that sections 3(b) and 3(d) are the relevant portions of the

---

[6]     As pointed out by Defendants at pp. 57-58 of their brief, and at oral argument, Frazier Industries has not *specifically* appealed from the district court's alternative conclusion. Defendants argue, therefore, that any challenge to that conclusion now is waived as untimely. While it is curious that Frazier Industries ignored this issue in its opening brief, the Court does not consider the issue waived for purposes of these appeals, especially in light of the fact it was an *alternative* basis for the district court's decision, from which the current appeals arise. Nor does the Court, however, consider the issue a "red herring" trumped up by Defendants, as Frazier Industries suggests. Indeed, the district court specifically considered this issue, albeit in the alternative, and held that it would dispose of Frazier Industries' breach of contract claim if a contract had been found to exist. It is, therefore, anything but a red herring.

[7]     Paragraph 4 of Part One of the Agreement limits Frazier Industries' right to conduct due diligence to the 45 day period described therein, hence any "interference" with those rights could occur, if at all, only during that period. Similarly, Paragraph 2 of Part Two of the Agreement binds the Defendants to an Exclusive Dealing obligation only during the "Due Diligence Period." While that term is not defined in that paragraph, its use with initial "caps" undoubtedly references the definition in Paragraph 4 of Part One, which is the time period extending 45 days from the Agreement's execution date (i.e., September 8, 2001). Frazier Industries does not contend that the Defendants solicited or negotiated with MNP during that period.

17

"Break-Up Fee" provision. Frazier Industries asserts that the Defendants are liable under these clauses because they terminated negotiations with Frazier Industries and entered into alternate financing and stock transactions within one year. Frazier Industries argues that these provisions are not temporally limited (i.e., are independent of the 45-day Due Diligence Period) and that a termination of negotiations at any time, so long as it is followed by an alternative transaction within one year, would obligate the Defendants to pay $475,000 to Frazier Industries to compensate Frazier Industries for the time and effort spent in evaluating and working toward a transaction that never came to fruition. We disagree with this reading of the Agreement.

We find that a fair reading of the Agreement reveals that the $475,000 "Break-Up Fee" was triggered only if the Defendants terminated negotiations 1) within the 45-day Due Diligence Period; and, 2) within one year thereafter, entered into a substantially similar refinancing arrangement with another party. Frazier Industries' argument, that the 45-day time limit pertains only to the Defendants' obligation to negotiate in good faith, but does not in any way pertain to their obligation to pay the "Break-Up Fee," quite simply, is not well taken.

The "Break-Up Fee" provision clearly asserts that the initial triggering event for the payment obligations therein is a "terminat[ion] of negotiations toward a Definitive Agreement." The question this Court must answer, accordingly, is what the phrase "negotiations toward a Definitive Agreement" means in this context. Neither the term "Definitive Agreement," nor the phrase "negotiations toward a Definitive Agreement," are defined expressly in the "Break-Up Fee" provision. Indeed, they are not defined anywhere in Part Two of the Agreement. The use of initial "caps" when using the term "Definitive Agreement" in mid-sentence implies, however, that the parties understood it to have a particular meaning under the Agreement. The preamble to Part One

18

defines "Definitive Agreement" as a "written agreement providing for the Transaction," which is earlier defined to constitute the recapitalization of GFC that the parties hoped to achieve. Thereafter, Paragraph 3 of Part One of the Agreement is captioned "Definitive Agreement." As noted previously, that section provides:

> 3.    DEFINITIVE AGREEMENT
>
> The Parties will negotiate in good faith toward[] a Definitive Agreement. There will be no obligation to negotiate beyond the end of the Due Diligence Period. Any Definitive Agreement will contain representations, warranties, indemnities and agreement by [GFC] and Grossman as are customary in transactions of this type.

That paragraph, in turn, incorporates the defined term "Due Diligence Period." As noted, "Due Diligence Period" is defined at Paragraph 4 of Part One of the Agreement to cover the time period from 45 days after the execution of the Agreement.

Read together, we find that, because the parties had an obligation to negotiate in good faith toward a Definitive Agreement only during the Due Diligence Period, a "termination" of negotiations "toward a Definitive Agreement" could occur within the meaning of the "Break-Up Fee" provision only if it occurred *during* the 45-day Due Diligence Period. At oral argument, Frazier Industries' counsel argued against this conclusion on grounds that the definitions of "Definitive Agreement" and "Due Diligence Period," as well as the defined scope of the parties' obligations to negotiate in good faith, appear in Part One of the Agreement, which was not meant to be legally binding. Counsel asserted that nothing in Part One could be read to limit, or define, the obligations in the "legally binding" portions of the Agreement, found in Part Two. As we concluded earlier, however, when determining whether an enforceable contract existed, it is unreasonable – indeed impossible – to read Part Two of the Agreement in a vacuum.

On its face, Part Two contains terms and phrases that are specifically <u>defined</u> within the

19

meaning of the Agreement. While the definitions of those items appear in the first instance in Part One, they are expressly incorporated into Part Two. Thus, although Part One may be "non-binding" when standing alone, certain of its provisions are used to define and delimit the legally binding obligations of the parties in Part Two. For this reason, we must reject Frazier Industries' suggestion that we ignore Part One of the Agreement in our effort to divine the meaning of Part Two.

Rather, we read the language used in Part Two in light of the definitions and parameters given to that language in Part One and conclude that, because the parties no longer had an obligation to negotiate toward a Definitive Agreement after the Due Diligence Period ended, the Defendants cannot be charged a fee for "termination" of negotiations after that time. Because Frazier Industries concedes that the Defendants negotiated in good faith and cooperated with Frazier Industries' due diligence efforts until well after the expiration of the Due Diligence Period, the Defendants did not breach the Agreement, and are, therefore, not subject to a "Break-Up Fee."[8]

### *We Decline To Assess The Enforceability Of The "Break-Up Fee".*

Frazier Industries also argues that the district court erred when it found that, under Michigan law, the $475,000 "Break-Up Fee" constituted a penalty, or an otherwise unenforceable liquidated

---

[8]  At oral argument, Frazier Industries' counsel argued that Frazier and Savas should be entitled to compensation for the substantial efforts they made, during and after the Due Diligence Period, to save GFC from financial ruin. While this may be true, the parties did not bargain for such repayment except in the circumstances described in the Agreement, which we have found did not come to pass. The parties could have drafted the Agreement to provide that Frazier and Savas would be compensated for their time if the Due Diligence Period ended without a Definitive Agreement in place, but they did not do so. Frazier Industries has, moreover, made it clear at all stages of these proceedings that it has not pursued, and does not wish to pursue, any non-contract theory of recovery for its services, which specifically include the services individually rendered by Frazier and Savas.

damages provision. Unlike the district court, Frazier Industries characterizes that provision as either a *termination fee* that the parties negotiated and agreed upon, or an *enforceable* liquidated damages provision. The district court relied on *Curran v. Williams*, 89 N.W.2d 602 (Mich. 1958), and concluded that the provision was an unenforceable penalty because it provided for payments well beyond those justified by the time and effort expended by Frazier Industries.

While the parties spent much of their energy, both in their briefs and at oral argument, debating both the factual and legal soundness of the district court's conclusions on this issue, given our conclusion that the "Break-Up Fee" was not implicated by the circumstances under which the parties' relationship ended, we decline to address the validity of that provision.

### CONCLUSION

The district court erred when it found that the parties did <u>not</u> enter into a legally enforceable contract. Its ultimate result – that Frazier Industries could not recover a $475,000 "Break-Up Fee" – is correct, however, because this Court finds that, while a contract existed, it was not breached.

Accordingly, as to the appeal in Case No. 03-1385, the district court's order granting the Defendants' motion for summary judgment is **AFFIRMED, on the basis of that court's alternate holding only**. As to the appeal in Case No. 03-1395, the district court's dismissal of the Defendants' counterclaim is also **AFFIRMED**.

21