NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0488n.06

Nos. 16-4054/16-4094

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| PAUL MATUS, | ) |
| | ) |
| Plaintiff-Appellee/Cross-Appellant, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE |
| LORAIN COUNTY GENERAL HEALTH | ) NORTHERN DISTRICT OF |
| DISTRICT, et al., | ) OHIO |
| | ) |
| Defendant-Appellant/Cross-Appellees. | ) |
| | ) |

BEFORE: SILER, CLAY, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Lorain County General Health District (the "health district") appeals the district court's denial of its motions for judgment as a matter of law and for a new trial, as well as the court's entry of a $615,175.18 judgment in favor of its former medical director, Plaintiff-Appellee Paul Matus, on Matus's breach-of-contract and retaliation claims, based on a remitted jury verdict of $1,365,175.18. Matus cross-appeals the remittitur and the grant of summary judgment to the health district on three other claims. For the reasons that follow, we (1) reject the health district's challenges to the jury's verdicts and the court's rulings, (2) agree with the health district that remittitur is required under Ohio law, and (3) agree with Matus that the district court erred in choosing the remittitur amount. We **AFFIRM** in part, and **VACATE** and **REMAND** in part.

**I**

**A**

The Lorain County General Health District is a state agency responsible for public-health services in Lorain County, Ohio. A board of health (the "board") governs it, and a commissioner, appointed by the board, manages it day to day.

Paul Matus was the health district's medical director from 1991 through early 2013, when the board discharged him. Matus's employment agreement provided that he would serve as medical director from March 31, 2009, at an annual salary of $48,000, "for an indefinite and continuing term" and that the agreement would be terminable on thirty days' written notice for "cause," including, but not limited to, "breach or neglect of duty, violation of any law, dishonesty, insubordination, or gross misconduct." R. 1-1, PID 34–35. He contends he was discharged without "cause" and in retaliation for participating in a workplace investigation.

In July 2012, commissioner Ken Pearce announced his intention to retire. After retiring, Pearce would begin drawing retirement benefits, and, after a sixty-day waiting period, would return to the health district as interim commissioner, allowing him to receive a salary as well. Edward von Hofen, the board's president and Matus's brother-in-law, told Matus at a backyard picnic that he was uncomfortable with Pearce's plan. Matus replied that the arrangement is "not uncommon," but agreed that it would be good for the health district to have new leadership. Trial Tr., R. 109-1, PID 4062–63. At the board's August 15 meeting, von Hofen opposed Pearce's plan to retire and then return, but the board voted to accept it. Tanas Wilcox, the health district's nursing director, testified that after the August 15 meeting, Pearce told her that he would fire her and that "someone else was going to take care of [Matus]." Trial Tr., R. 114, PID 4400.

About two weeks later, Pearce wrote to Benjamin Davey, a prosecutor who served as counsel to the health district, about a conversation he had with board-employee Stephanie Charles. This conversation took place a week before the August 15 board meeting and three weeks before Pearce reported it:

> Ms. Charles stated that while she was instructing Dr. Matus on how to access and use the Emergency Alertfind website, he sat uncomfortably close to her and began a conversation of a personal nature including comments alluding to his relationship with his wife. His statements included characterizing his wife as acting old and going to bed like an "old woman." Stephanie commented that these comments made her uncomfortable and were unrelated to the work environment and of a sexual nature that she felt she would be in a very difficult situation if Dr. Matus were to be named health commissioner.

Aug. 28, 2012 Lett., R. 58-9, PID 786.

Charles testified that during the winter of 2010/2011, she trained Matus on how to use a software program. During the training he discussed personal matters while sitting uncomfortably close to, but never touching, her: "I don't think he was aware that I felt like my personal space was violated. I don't think he took that into consideration." Trial Tr., R. 108, PID 2876.

Plaintiff's expert, organizational-behavior professor Susan Case, testified that she did not "think that the statement by Stephanie Charles that she was made uncomfortable warranted an outside investigation." Trial Tr., R. 110, PID 3430. But the prosecutor's office, assistant prosecutor Gerald Innes testified, determined that given Matus's stature, it would be best to engage an outside firm to investigate. Prosecutors briefed the board at its September 12 meeting that an employee complained of Matus making inappropriate comments; they recommended an investigation, which the board hired Clemans, Nelson & Associates ("CNA"), a human-resources firm, to conduct.

Between October 26 and November 5, CNA investigator Sandy Conley interviewed five young females who were current or former employees of the health district, including Charles. During the investigation, Charles confirmed that there was no inappropriate touching by Matus, that he sat uncomfortably close to her, and that she was uncertain whether he realized he was sitting too closely. Other interviewees described Matus's conduct toward younger women in the office as "awkward," "creepy," "weird," or "overly flirtatious," including compliments about their personal appearances. Conley Report, R. 58-17, PID 817. But the interviewees were not offended by the comments, explaining that some in the office viewed them as part of Matus's personality, or as an example of "generational differences." *Id.* at PID 817–18.

Conley found that although Matus did not sexually harass Charles, and no other evidence suggested that Matus engaged in sexual harassment, he should nevertheless be counseled to avoid making comments about the appearance of female employees and to respect personal space. Her report suggested that the disconnect between Matus and younger female employees could be generational. Conley testified that she did not interview Matus because she did not believe his conduct was sexual harassment, and that she would have interviewed him if she had concluded otherwise.

Conley delivered her conclusions orally to Davey on Friday, December 7. The next day, Matus received a call from Laura Baus-Fenick, a former health-district employee whom Conley interviewed, to alert him to the investigation. She testified that she told Matus she believed Charles was the source of the investigation because her name was conspicuously missing from the interview list. Matus testified that this call from Baus-Fenick sent him into a panic, leaving him embarrassed, humiliated, and confused. Seeking answers, he asked the health district's

administrative director, Tonya Kollen, "is there something going on about me? . . . . Am I being investigated?" Trial Tr., R. 114, PID 4093. Kollen responded "No, Dr. Matus, no." *Id.*

On December 13, Conley presented her findings to Dave Covell, then the acting commissioner of the health district. Conley told him that Matus had not engaged in sexual harassment, and that she found only a "sensitivity issue" that should be addressed with training. Trial Tr., R. 109-1, PID 3905. After the board heard a summary of Conley's findings at its December 12 board meeting, it instructed Covell "to tell [Matus] that . . . there were a few complaints, there was an investigation done, and that it turned out that there was not, it did not amount to sexual ha[]rassment, but that there were some sensitivity training needs . . . .". Trial Tr., R. 108, PID 3142. Covell planned to talk to Matus at the lunch the two planned to have two days later. Covell testified that at that time the matter was still open:

> The idea was [after I spoke to Matus] he would have an opportunity to talk to the Board and the Board could say, "Here is what happened, this is what it is, we want to talk to you a little about it," talk about sensitivity, and Dr. Matus could explain he didn't mean it that way or whatever you want to explain, and at that point we'd say okay, we'll move on with sensitivity training, and that would be it.

*Id.* at PID 3144.

Covell had lunch with Matus on December 14:

> I told him the results of what happened and that we had this preliminary result, but we didn't have the final written document, so it wasn't officially, I guess, over until that point, yes, so I did tell him that here's the results, here's what would happen, there wouldn't be any discipline, it was a sensitivity issue, there would be some sensitivity training, and the final document would easily be there by the next month board meeting and at that point he could talk to the Board or whatever.

Trial Tr., R. 109-1, PID 3911.

Three days after the lunch, Covell sent an email to the board:

> . . . I told [Matus] that when the board has the entire investigation reported to you that there would be a more formal conversation. . . . Hopefully, he will digest the conversation prior to the board meeting and we can put this behind us . . . .

Dec. 17, 2012 Email, R. 58-20, PID 834–35.

Despite the plan for Matus to address the board, Covell would not tell him what the factual basis of the investigation was. At trial, Covell agreed when plaintiff's counsel asked him whether he told Matus "that there were *multiple* complaints from women." Trial Tr., R. 109-1, PID 3913 (emphasis added).

Matus testified that he had no information about the investigation, apart from suspecting that Charles was the source, and that being kept in the dark about the complaints and allegations caused him to suffer substantial anxiety and emotional distress. On January 6, he decided to call Charles's ex-husband, David Charles ("David"), with whom he was acquainted, seeking information to use in preparing for the board's upcoming meeting.

Matus recognized that the call would be sensitive, resolved to "be very careful," and did not want to "insult" David. *Id.* at PID 4112. He first asked whether David was aware of the investigation; David said he was not. Next, Matus asked "[d]o you think that Stephanie, you know, would be capable of doing that for some reason?" David replied "[n]ot the Stephanie I know." *Id.* Matus testified that he made no disparaging comments, explaining that he was just desperate for information because he did not want to go before the board unprepared.[1] Matus testified that he asked only a few questions about Charles at the beginning of the fifty-two minute call, the balance of the conversation being about other topics.

---

[1] He did, however, admit that asking David a question to the effect of "is she capable of doing something like that," could be perceived as insulting. *Id.* at PID 4114.

-6-

David testified that he was acquainted with Matus, but did not know him well, and that during the call, Matus asked him repeatedly whether Charles was a woman of integrity. Matus also asked whether Charles would fabricate a story, implying that she was dishonest; David responded that she was "a woman of good morality." Trial Tr., R. 114, PID 4500. David acknowledged that Matus did not directly accuse Charles of being a liar or of other wrongdoing, nor did he directly attack her. David confirmed that he and Matus discussed topics other than Charles, including scuba diving and a high-school forensics class. After hanging up, David called Charles, who became upset that Matus had contacted David.

Charles notified Kollen and Covell. Although Charles was "infuriated" by Matus's call to her ex-husband, which she considered harassing, she admitted at trial that the call did not have an adverse effect at work. Trial Tr., R. 108, PID 2903, 2905–07. Kollen was surprised that Matus called David, and considered the call to be retaliatory toward Charles. Case disagreed, testifying that under the health district's personnel policy, the retaliated-against employee's work must be adversely affected, a condition not satisfied by the call to David.[2]

Matus was not allowed to address the board at its January 9 meeting. Board vice-president William Spreng testified that Covell told the board during its executive session, from which Matus was excluded, that Matus called Charles's ex-husband and made "disparaging" comments about her. Trial Tr., R. 108, PID 3106–07. The board reviewed no documentation, but it considered the call to be an "[e]xtremely serious" matter, indeed, grounds for discharge. *Id.* at PID 3107–08. Spreng and other board members agreed that Matus should be given an opportunity to resign. The board instructed Spreng, Covell, and Innes to tell Matus that it was

---

[2] The policy provides that it "shall be unlawful, inappropriate and a violation of this policy for any employee who is the subject of a sexual harassment investigation to take retaliatory action so as to affect the work environment of the complainant or any person involved in the investigation." R. 58-5, PID 776.

aware of the call to David, that it considered the call to be a "very serious matter," and to recommend that he resign rather than be discharged. *Id.* at PID 3109.

Matus testified that after the executive session, Covell motioned him over and said "[t]he Board wants to know if you will come to a meeting on Friday and have a meeting." Trial Tr., R. 109-1, PID 4118. Matus demanded to know what the meeting was about: "Is it about this investigation? . . . . I want [sic] know everything. . . . . I'm just literally, physically dying. I can't eat, I can't sleep. I need to know. Will you please tell me?" *Id.* Covell, according to Matus, replied "[w]e'll tell you everything," and when asked, told Matus that he did not need a lawyer and that this would be a private meeting. *Id.* at PID 4118–19. Spreng, Covell, Innes, and Matus attended the meeting. Innes refused to give Matus information about the sexual-harassment investigation, adding that "[w]e have a bigger problem now." *Id.* at PID 4121–22. Innes told Matus that the board intended to discharge him because he had reached into Charles's personal life by contacting her ex-husband. Matus testified that Innes threatened him: "[Y]ou have five business days to resign and go away quietly or it is going to become public. . . . And we'll terminate you publicly." *Id.* at PID 4130.

Matus refused to resign. The board resolved to discharge him for "cause," subject to a pre-disciplinary hearing presided over by neutral Frank Hatfield. It brought seven "cause" charges against him. Hatfield found misconduct on Matus's part on three: that he (1) made "personal and derogatory attacks" on the character of female employees, including Charles; (2) contacted David; and (3) threatened to blow the whistle on misconduct in the health district, but refused to provide supporting documentation. R. 58-29, PID 858–59.

The board voted on April 10 to terminate Matus's employment for "cause" based on "engag[ing] in multiple acts of misconduct and with respect to your interaction with District

employees and family members." Apr. 12, 2013 Lett., R. 75-16, PID 2372. The termination was effective May 17, and this action followed.

**B**

Matus brought suit in state court against the health district, Pearce, Spreng, Covell, and Innes, alleging nine counts: (1) breach of contract, (2) breach of contractual good faith, (3) state-law age discrimination, (4) state-law age-based hostile work environment, (5) state-law unlawful retaliation, (6) invasion of privacy (false light), (7) defamation, (8) intentional affliction of emotional distress (IIED), (9) and First Amendment retaliation under 42 U.S.C. § 1983. The defendants removed the action based on the First Amendment retaliation claim, and Matus amended his complaint to drop the defamation and invasion-of-privacy claims.

Both Matus and defendants sought summary judgment. The district court denied Matus's motion in its entirety; it granted summary judgment in part to defendants on Matus's First Amendment, age-discrimination, hostile-work-environment, and IIED claims; it denied summary judgment on the contract and state-law retaliation claims.[3]

After the close of Matus's case in chief, the health district moved for judgment as a matter of law ("JMOL"); the district court did not address the motion at that time, acknowledging that the health district had reserved its right to renew the motion after the verdict. *See* Fed. R. Civ. P. 50(a)–(b).

---

[3] The district court initially held that Matus's participation in the January 11 meeting qualified as "participating" in an investigation under Ohio law, but that his call to David did not. The court reversed course at trial, however, and allowed the call to David to be considered in relation to the retaliation claim: "when you hear more of the evidence and it becomes more clear, I think it was wrong to exclude the phone call aspect on the retaliation claim." Trial Tr., R. 111, PID 3722. Before closing arguments, the court instructed the jury that it could consider the call to David in deciding whether the health district retaliated against Matus. Contrary to the health district's argument on appeal, this decision did not prejudice it. The health district consistently argued that it discharged Matus because he retaliated against Charles. If true, this assertion would mean that there was "cause" to discharge Matus (i.e., the board did not breach the contract) and that his call to David was misconduct, not mere participation in an investigation (i.e., the board did not retaliate). Nothing stopped the health district from making its case that Matus retaliated against Charles and as a result was discharged for cause. And had the jury believed this argument, it would have returned verdicts in the health district's favor.

Matus presented the deposition of certified public accountant and valuation expert Charles Ciuni regarding his economic damages. Ciuni calculated that Matus's economic damages—from past and future lost wages and benefits—amounted to $365,175.18. Additionally, Matus testified that he suffered considerable physical and mental distress from the investigation and his discharge.

The district court instructed the jury that economic damages for the breach-of-contract and retaliation claims would be the same and should not be duplicated, and that it was permitted to award non-economic damages only for the retaliation claim:

> I told you what the breach of contract damages were.
>
> ***
>
> [I]f you deliberated on Count 1 [breach of contract] and found in favor of Dr. Matus and then awarded damages per these instructions in Count 1 . . . and find in Dr. Matus' favor on Count 2 [retaliation] . . . [s]ome of the damages are duplicative is what I'm saying. That means you wouldn't award double damages if you find in favor of Dr. Matus on Count 1 and Count 2. However, there are some damages that Dr. Matus can recover in Count 2 that are not covered in Count 1.
>
> ***
>
> So when I read all the damage calculations in Count 2, keep in mind that in the event you find in favor of Dr. Matus on Count 1, part of the damages you wouldn't consider in Count 2 because they are duplicative. I think that's clear.

Trial Tr., R. 112, PID 3817.

The jury returned verdicts in favor of Matus, awarding him $365,175.18 (the same amount calculated by Ciuni) in economic damages on his contract claim, and $0 economic and $1,000,000 non-economic damages on his retaliation claim.

After verdict, the health district renewed its JMOL motion. *See* Fed. R. Civ. P. 50(b). It argued that the law and evidence could not have supported Matus's contract and retaliation claims because (1) he was an unclassified employee and thus his employment contract was void,

(2) he was terminated for cause, (3) he did not participate in "protected activity" under Ohio law, (4) and, in any case, his participation in the investigation was not a but-for cause of his discharge, but rather he was discharged for retaliating against Charles.

In the alternative, the health district sought a new trial, arguing that the jury's verdict was against the manifest weight of the evidence in light of Hatfield's finding that Matus engaged in misconduct by calling David. It also argued that a new trial, or remittitur, was warranted because the damages were duplicative between the contract and tort claims, and there was no evidence it caused physical or mental injury to Matus. Finally, it argued that the $1,000,000 award for the retaliation claim exceeded Ohio's statutory cap on tort non-economic damages.

The district court denied the JMOL and new-trial motions and granted the remittitur motion. It entered judgment in favor of Matus, reducing his non-economic damages to $250,000.

## II

### A. Judgment as a Matter of Law

We review de novo the denial of a motion for JMOL. *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 509 (6th Cir. 2016). Judgment as a matter of law is appropriate only where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party[.]" Fed. R. Civ. P. 50(a)(1). In diversity cases, we apply the forum state's standard of review to sufficiency-of-the-evidence challenges. *Aetna Casualty & Surety Co. v. Leahey Constr. Co.*, 219 F.3d 519, 532 (6th Cir. 2000). Under Ohio law:

> The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion [for judgment notwithstanding the verdict] is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion

> must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination . . . .

*Posin v. A.B.C. Motor Court Hotel, Inc.*, 344 N.E.2d 334, 338 (Ohio 1976).

Breach of Contract

In order to establish a breach of contract, "it must be shown by a preponderance of the evidence that (1) a contract existed, (2) one party fulfilled his obligations, (3) the other party failed to fulfill his obligations, and (4) damages resulted from that failure." *Blake Homes, Ltd. v. FirstEnergy Corp.*, 877 N.E.2d 1041, 1052 (Ohio Ct. App. 2007). All contracts formed under Ohio law contain an implied covenant of good faith and fair dealing. *Third Fed. Sav. & Loan Ass'n of Cleveland v. Formanik*, 64 N.E.3d 1034, 1048 (Ohio Ct. App. 2016) (collecting cases). "'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' . . . [B]ad faith may consist of inaction, or may be the 'abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance.'" *Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (2005) (quoting Restatement (Second) of the Law of Contracts § 205 cmts. a, d.) (final alteration in original).

On appeal, the health district argues that there was no legal basis for the jury's contract-claim verdict because Matus was an unclassified employee, making his discharge-only-for-cause job protection void as against public policy. Public employees in Ohio are either "classified" or "unclassified." Classified employment entitles the employee to retain his position "during good behavior and efficient service," O.R.C. § 124.34(A), whereas unclassified employees do not receive tenure protection and may be discharged without cause. *See State ex. rel. Trimble v. State Bd. of Cosmetology*, 364 N.E.2d 247, 249 (Ohio 1977).

Under § 3709.13, "[e]mployees of [a general health district] board, other than the commissioner, shall be in the classified service of the state, and all employees of the board may be removed for cause by a majority of the board."

The health district argues that § 3709.13 deals with the appointment of staff, e.g., nurses and physicians other than the medical director, noting that those staff members are appointed on the "recommendation" of the commissioner. In contrast, under § 3709.11, when the commissioner is not a physician, a medical director is appointed directly by the board. The health district is correct up to that point, but it does not overcome § 3709.13's plain language that "employees . . . other than the commissioner, shall be in the classified service of the state . . . ." When § 3709.13 expressly carves the commissioner out of the classified service, it implies that all other board employees are classified, including the medical director. The health district counters this interpretation by arguing that because medical directors hold responsibilities that physician commissioners otherwise would have, they too should be carved out of the classified service. But this public-policy argument conflicts with § 3709.13's express grant of civil-service protections to all health-district employees other than the *commissioner*. Thus, the health district has not shown that the contract was void as a matter of law.

As for the facts, the jury saw the employment agreement and the health district's harassment policy. It also heard testimony from witnesses involved in the investigation, the phone call to David, and the events surrounding Matus's discharge. In closing arguments, the health district told the jury that Matus's call to David was retaliatory and justified his discharge for "cause." Matus, however, contended that the call to David was not retaliatory and thus there was no "cause" basis for his discharge. Reasonable minds could disagree, but the evidence was

such that the jury, after weighing it, could find a breach of contract. The district court properly denied the health district's motion for JMOL.

Ohio State-Law Retaliation

Ohio law prohibits retaliation against an employee who "has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under [Ohio's civil-rights law.]" O.R.C. § 4112.02(I). Ohio follows the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), framework for establishing prima facie cases of unlawful retaliation. *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007). To establish a prima facie case, a plaintiff must show that (1) he engaged in a protected activity, (2) the defendant was aware that he engaged in that activity, (3) the employer took an adverse employment action against him, and (4) there was a causal connection between the protected activity and adverse action. *Id.* This prima facie case may be rebutted by the employer's proffer of a legitimate, non-retaliatory reason for the adverse action, shifting the burden to the employee to show that the proffered reason was not the true reason. *Id.* (citations omitted).

The health district focuses on the phone call to David both to attack Matus's prima facie case and to rebut it. It argues that Matus's call to David was not "protected activity" because Matus was not participating in an "investigation," and that Matus was fired because the call was retaliatory toward Charles, in violation of its policy. On this point too the JMOL motion fails. The jury heard testimony that when Matus called David, the investigation was still open and the parties expected that Matus would appear before the board in connection with it. Matus testified that he had been unable to obtain information about the investigation, was anxious about being unprepared when he appeared before the board, and contacted David not to retaliate against Charles, but rather to prepare. Hearing this evidence and the accounts of the conversation, the

jury was free to find that (1) Matus participated in the investigation by seeking information about it, (2) that the health district knew he sought this information, and (3) that the health district ultimately terminated his employment because he did so. Further, the jury heard sufficient evidence to reject the health district's explanation that it believed that Matus's call to David was itself retaliatory and thus grounds for his discharge.

### B. Motion for a New Trial

We review the denial of a motion for a new trial for abuse of discretion. *Duncan v. Duncan*, 377 F.2d 49, 53 (6th Cir. 1967). A district court must deny such a motion "if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991). The health district's arguments in support of the motion for a new trial are the same as for the motion for JMOL, as is the result. Matus stated proper claims for breach of contract and retaliation and the jury's verdicts were supported by sufficient evidence. Thus, the district court did not abuse its discretion in denying the motion.

### C. Remittitur

Both the health district and Matus raise issues on appeal regarding remittitur, and we address them together. We review the denial of a motion for remittitur for abuse of discretion. *Smith v. John Swafford Furniture Co., Inc.*, 614 F.2d 552, 553 (6th Cir. 1980). We review questions of law de novo. *In re Town Center Flats, LLC*, 855 F.3d 721, 724 (6th Cir. 2017).

Because the amount of damages in a personal-injury action "is a matter within the province of the jury," *Carter v. Simpson*, 476 N.E.2d 705, 708 (Ohio Ct. App. 1984), remittitur is proper only "if the jury's award is so excessive as to appear to be the result of passion or

prejudice, or if the amount awarded is against the manifest weight of the evidence." *Menda ex rel. Justin v. Springfield Radiologists, Inc.*, No. 2001-CA-91, 2002 WL 31761562, at *2 (Ohio Ct. App. Dec. 6, 2002). Awards may also "be altered *as a matter of law*." *Arbino v. Johnson & Johnson*, 880 N.E.2d 420, 431 (Ohio 2007) (emphasis in original). Ohio law places a statutory cap on non-economic damages for most torts. Under O.R.C. § 2315.18(B)(2), these awards are limited to $250,000, or three times economic loss (to a $350,000 maximum per plaintiff); O.R.C. § 2315.18(F)(1) deprives Ohio courts of jurisdiction to enter judgments in excess of statutory caps.

The district court granted the health district's remittitur motion and applied § 2315.18(B)(2) to reduce the jury's $1,000,000 non-economic-damages award on the retaliation claim to $250,000. The health district argues that was still too much, because the "record was devoid of any evidence of intangible emotional loss to justify a large non-economic award." Appellant's Br. at 47. We disagree. The jury heard testimony from Matus about the substantial negative physical and emotional effects he suffered from the health district's retaliation. Although non-economic damages were supported only by Matus's testimony, the district court did not abuse its discretion in rejecting the argument that the jury's award was the result of passion or prejudice or against the manifest weight of the evidence.

The health district also argues that the tort award was improperly duplicative of the contract award. In support of this argument, it cites authority that a contract claim generally cannot also be recast as a tort claim. *See, e.g., Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981) ("The still valid rule of *Ketcham v. Miller*, []136 N.E. 145 ([Ohio] 1922), forbids parties to convert contract actions into tort actions by attacking the motives of a breaching party, as the motive of a breaching party is irrelevant to a contract action."). But this line of cases is

inapposite. *Ketcham* held that the allegedly wrongfully evicted tenants' complaint stated a claim only for breach of their lease—not for a tort—and thus they could not obtain punitive damages. *Ketcham*, 139 N.E. at 146. *Wolfe* was a statute-of-limitations case dealing with an insurer's bad-faith refusal to settle and the insureds' suit for the resulting out-of-pocket costs not covered by their policy limit. In that case, we observed that "Ohio courts would view actions to recover an amount in excess of policy limits as arising exclusively in tort, unless the insurance contract expressly delineates a standard of conduct by which the lawyering of the insurance company can be measured." *Wolfe*, 647 F.2d at 709. Contrary to the health district's argument, these cases recognized that a set of facts can support both a breach-of-contract and a tort claim. Here, Matus's tort claim is based on Ohio's statutory prohibition on retaliation against employees who engage in certain protected activities, including participating in investigations. O.R.C. § 4112.02(I); *cf. also Helmick v. Cincinnati Word Processing, Inc.*, 543 N.E.2d 1212, 1215 (Ohio 1989) (reversing summary judgment to employer on employee's breach-of-contract and common-law tort claims).

Additionally, the health district's argument that the jury awarded duplicative damages is not supported by the record. The district court instructed the jury that economic damages for the breach-of-contract and the retaliation claims would be the same and could not be duplicated. After the close of evidence, the district court presented draft jury instructions to the parties. Neither objected to its plan to instruct the jury to avoid duplicative economic damages.

The jury followed this instruction. It found that the health district breached the contract and awarded Matus $365,175.18 in economic damages. It also found that the health district unlawfully retaliated, and on that count it awarded Matus $1,000,000 in non-economic damages, but $0 in economic damages. These awards are clearly not duplicative.

Matus cross-appeals the district court's application of O.R.C. §§ 2315.18(B)(2) and (F)(1) to remit the $1,000,000 non-economic award. He argues, relying on the phrase "[a] court of common pleas has no jurisdiction to enter judgment . . . in excess of [§ 2315.18's] limits," that the caps set out in § 2315.18 do not apply in federal court, but rather only in the Ohio courts of common pleas. Here, the district court sat in diversity and properly followed the substantive law applicable in Ohio courts. *See Palmer v. Fox Software, Inc.*, 107 F.3d 415, 418 (6th Cir. 1997).

In the alternative, Matus argues that even if §§ 2315.18(B)(2) and (F)(1) apply, the proper remitted amount is $350,000, not $250,000. The health district responds that a different statute, which caps non-economic damages against "political subdivisions" at $250,000, is applicable, O.R.C. § 2744.05(C)(1). It is not certain whether "general health districts" are "political subdivisions" under this statute. *Cf. id.* at § 2744.01(F) (defining "political subdivision"). But, in any event, this statute states that it does not apply to actions by an employee "relative to any matter that arises out of the employment relationship between the employee and the political subdivision." *Id.* at § 2744.09(B). Thus, the district court properly turned to §§ 2315.18(B)(2) and (F)(1).

The $365,175.18 in economic damages allocated to the contract claim applied to the retaliation claim as well because the jury found for Matus on both claims and the district court instructed the jury that the economic damages would be the same for both claims and should not be duplicated.

Thus, the properly remitted non-economic-damages award is $350,000 because the statute allows up to three times the economic damages as non-economic damages (here, $1,095,525.54), subject to a $350,000 maximum. We therefore vacate this portion of the judgment and remand to the district court for entry of a $350,000 judgment on Count 2.

**D. Summary Judgment**

Matus cross-appeals the grant of summary judgment on his hostile-work-environment, IIED, and First Amendment retaliation claims. We review the grant of summary judgment de novo. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017). Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Because the jury awarded Matus his full economic and non-economic damages, we need not address his hostile-work-environment and IIED claims. *See Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 534 n.1 (6th Cir. 1989). We consider his First Amendment retaliation claim, however, because it carries the added potential for attorney fees under 42 U.S.C. § 1988(b).

A plaintiff establishes a prima facie case of First Amendment retaliation when he shows that (1) he engaged in activity protected by the First Amendment, (2) he suffered an adverse action that would likely chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the adverse action was at least in part motivated by the protected activity. *Leary v. Daescher*, 228 F.3d 729, 737 (6th Cir. 2000) (citation omitted).

Public employees' speech is protected by the First Amendment when they speak as citizens addressing matters of public concern. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007). However, when they "make statements pursuant to their official duties" they do not speak "as citizens for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

Matus argues that he was retaliated against due to his brother-in-law's opposition to Pearce's retire/rehire plan, and that this constituted First Amendment retaliation. He lacks

standing, however, to assert that he was retaliated against for his brother-in-law's speech. *Moody v. Michigan Gaming Control Bd.*, 847 F.3d 399, 402 (6th Cir. 2017).

He also argues that he was directly retaliated against for criticizing the competence of the board and its investigation during his January 11 meeting with Spreng, Covell, and Innes. However, these comments were made in the course of Matus's official employment and thus cannot give rise to a First Amendment retaliation claim. *Garcetti*, 547 U.S. at 421. The district court did not err in granting summary judgment on this claim.

### III

For the foregoing reasons, we **VACATE** the judgment of the district court and **REMAND** with instructions to enter judgment, and for further proceedings, consistent with this opinion. We **AFFIRM** in all other respects.