NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0128n.06

Nos. 22-3303/3367

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| CINCINNATI DEVELOPMENT III, LLC, | ) | **FILED**<br>Mar 14, 2023<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee/Cross-Appellant, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| CINCINNATI TERRACE PLAZA, LLC, | ) | |
| Defendant-Appellant/Cross-Appellee. | ) | |
| | ) | OPINION |

Before: READLER, MURPHY, and MATHIS, Circuit Judges.

The court delivered a PER CURIAM opinion. MATHIS, J. (pp. 32–38), delivered a separate opinion concurring in part and dissenting in part.

PER CURIAM. This case concerns a dispute over the sale of a property in Cincinnati (the "Property"). Initially, Cincinnati Terrace Plaza, LLC ("Seller") agreed to sell the Property to Cincinnati Development III, LLC ("First Buyer") with the caveat that Seller could continue to market the Property to other potential buyers subject to First Buyer receiving a right of first refusal to match any subsequent offer.

As permitted by Seller and First Buyer's contract, Seller continued to market the Property and, during First Buyer's Inspection Period, agreed to sell the Property to Cincinnati Terrace Associates, LLC ("Second Buyer") for a higher purchase price. But, Seller never informed First Buyer of the second offer, nor provided First Buyer with the right of first refusal to match Second

Buyer's terms. The Property was then conveyed to Second Buyer for a higher purchase price. First Buyer learned of Seller's contract with Second Buyer only after the Property had already been sold.

First Buyer filed suit against both Seller and Second Buyer asserting several contractual and statutory claims. After a bench trial, the district court ruled in favor of First Buyer on its contractual claims but dismissed First Buyer's statutory and equitable claims. The court awarded First Buyer damages in the amount of $1.7 million. Seller appeals the district court's judgment and First Buyer cross-appeals the court's dismissal of its statutory claim. For the following reasons, we **AFFIRM** the district court's judgment on all liability issues, **REVERSE** the court's damages award to First Buyer, and **REMAND** for modification of that award.

## I.

The Property was formerly known as the Terrace Plaza Hotel, a mid-century hotel, office, and retail building with historical and architectural significance. While once a luxury hotel, the building had been mostly vacant for years and had fallen into serious disrepair. As a result, the Property was difficult to sell and costly to maintain.

### A. The 2017 Purchase Agreement

Seller started marketing the Property for sale in late 2016. After receiving several offers, Seller determined that First Buyer's was the most attractive, and they entered contract negotiations. These negotiations culminated in the June 30, 2017, Membership Interest Purchase Agreement ("2017 Purchase Agreement") to purchase the Property for $12.5 million.

The 2017 Purchase Agreement provided for a 75-day inspection period and gave First Buyer the option to extend the inspection period by 30 days for a non-refundable payment of

$15,000. It also required First Buyer to deposit $150,000 into an escrow account as earnest money within five days of the agreement's effective date, which First Buyer did.

For the building to be worth the $12.5 million purchase price, First Buyer determined that it needed to obtain tax options and incentives from the City of Cincinnati ("City"). As a result, during the inspection period, and in addition to its due diligence, First Buyer met with City officials, business leaders, real estate development companies, and various banks to obtain such options and incentives. After conducting its due diligence, First Buyer terminated the 2017 Purchase Agreement.

## B. The 2018 Purchase Agreement

Despite terminating the 2017 Purchase Agreement, First Buyer remained interested in the Property, and the parties continued to work with each other on a potential new deal. Ultimately, First Buyer entered into another Membership Interest Purchase Agreement ("2018 Purchase Agreement") with Seller to purchase the Property for $9.5 million. The effective date of the Agreement was June 1, 2018.

The 2018 Purchase Agreement's contemplated conveyance structure mirrored that of the 2017 Purchase Agreement to avoid certain Ohio transfer taxes. Specifically, no later than three days prior to the closing date, First Buyer would, with Seller's involvement and consent, form a new Ohio LLC in which Seller would be the sole member. Then, one day prior to the closing, Seller would convey the Property to the newly formed LLC through a limited warranty deed. Subsequently, on the closing date, Seller would sell 100% of the membership interests in the LLC to First Buyer.

The 2018 Purchase Agreement also required First Buyer to deposit $150,000 into an escrow account five days after the Agreement's effective date. But, at the time of the Agreement's

execution, First Buyer had no legal representation or escrow agent to manage the process for making the payment. Thus, in the executed Agreement, the escrow section contains a blank space for First Buyer's counsel, and no one signed the Agreement as escrow agent on First Buyer's behalf.

The 2018 Agreement provided First Buyer with a 60-day period for First Buyer to investigate the Property (the "Inspection Period"), during which First Buyer could terminate the contract without forfeiting its escrow payment. But, after the Inspection Period, the payment would become nonrefundable and would be applied to the purchase price at closing.

The 2018 Purchase Agreement provided for a closing within 30 days after the expiration of the Inspection Period as long as the Agreement had not been terminated before that expiration. Importantly, if the parties failed to close on the Property due to Seller's breach, First Buyer could either (1) "elect to enforce the terms [of the 2018 Purchase Agreement] by action for specific performance, and/or exercise any other right or remedy available to it at law or in equity" or (2) "terminate [the agreement] by notice to Seller and receive a full refund of the Earnest Money plus reimbursement" from Seller for due diligence costs not to exceed $50,000. Agreement, R. 7-4, PageID 347.

The 2018 Purchase Agreement permitted Seller to continue marketing the Property to third parties until the closing occurred. But, an amendment to the Agreement was also contemporaneously executed to provide First Buyer with a right of first refusal to match any subsequent third-party offers ("ROFR Amendment"). Specifically, if Seller agreed to sell the Property to a third party before the Inspection Period expired, Seller had to provide notice of the closing to First Buyer. First Buyer would then have the option to purchase the Property by matching the third party's terms, including the purchase price. If First Buyer chose not to match,

Seller could terminate the 2018 Purchase Agreement by providing written notice of termination and paying a $100,000 termination fee within ten days.

Despite being required to make its $150,000 escrow payment no more than five days after the 2018 Purchase Agreement's effective date, First Buyer failed to do so. In fact, First Buyer failed to make the payment at any time during the Inspection Period. First Buyer also never inserted the name of its legal counsel in whose name the escrow account was to be jointly titled with Seller's counsel. Ultimately, First Buyer and Seller never jointly opened an escrow account at the contractually listed bank or any other agreed-upon bank.

From the outset of the 2018 Purchase Agreement's negotiation, "and due to a combination of the Property's decline and [First Buyer's] intent to limit [its] risk, First Buyer made it clear to Seller that, unless First Buyer received a tax incentive package from the City, it would not be willing to close the purchase of the Property. One piece of First Buyer's desired tax incentive package was tax increment financing ('TIF')." Op., R. 111, PageID 3958. But, "the City gave First Buyer push-back that resulted in delays due to the timing of certain City meetings required for TIF approval." *Id.* at 3959. These delays caused First Buyer to request extensions of the 2018 Purchase Agreement's Inspection Period almost immediately after the Agreement's execution. Seller did not authorize or approve any extensions of the Inspection Period.

### C. The Second Buyer Contract

As permitted by the 2018 Purchase Agreement, Seller continued to market the Property to potential third-party buyers. On June 12, 2018, Second Buyer entered into a Membership Interest Purchase Agreement ("Second Buyer Contract") with Seller to purchase the Property for $11 million.[1]

---

[1] Technically, Cincinnati Terrace Associates purchased the Property, but it was a company formed and purchased by Cincinnati Terrace Member, LLC as part of the Second Buyer Contract's conveyance structure.

Structurally, the Second Buyer Contract was very similar to the 2018 Purchase Agreement—Second Buyer would establish an LLC with Seller as the sole member, Seller would then transfer the Property into the LLC before the closing, after which, on the date of the closing, Seller would sell 100% of its membership interests in the LLC to Second Buyer. This arrangement was intended to avoid certain Ohio transfer taxes. That being said, the Second Buyer Contract was more favorable to Seller in several ways—the purchase price was higher, it lacked an inspection period (which enabled a quicker closing), and the initial escrow payment was both larger and nonrefundable.

### D.  Subsequent Developments

Seller never provided First Buyer with a right of first refusal to match Second Buyer's terms and failed to inform either buyer as to the existence of the other buyer's agreement. Instead, Seller actively assured both buyers that their contracts were valid. For example, on July 18, 2018, First Buyer met with Seller in anticipation of a meeting that First Buyer had with the City Planning Commission regarding First Buyer's TIF request. During the meeting, First Buyer pressed Seller on Seller's commitment to sell the Property to First Buyer and was assured by Seller that the parties were under contract.

Additionally, despite the 2018 Purchase Agreement being in place, Seller represented and warrantied in the Second Buyer Contract that the contract would not "conflict or result in a breach of any agreement to which Seller [was] a party." Second Buyer Contract, R. 56-1, PageID 1586.

Unaware of each other's contract, both buyers continued to work toward closing on the Property. First Buyer met with the City Planning Commission regarding its TIF proposal and received unanimous approval to move the proposal forward. Second Buyer secured financing, which included a $7 million loan and numerous other agreements to finance the transaction. In

sum, both buyers expended significant resources under the impression that they would be purchasing the Property.

Ultimately, and per the terms of the Second Buyer Contract, Seller conveyed the Property to Second Buyer on August 1, 2018, the day after First Buyer's Inspection Period expired. Two days later, First Buyer learned of the Property's sale to Second Buyer. First Buyer put $150,000 into an escrow account the same day.

### E. First Buyer's Lawsuit

On August 7, 2018, First Buyer filed suit against Seller in Ohio state court and obtained a temporary restraining order to enjoin the recording of the deed for 14 days. Nevertheless, the deed was recorded on the same day First Buyer filed suit. Subsequently, on August 10, 2018, First Buyer amended its complaint to include Second Buyer as a defendant and obtained an amended temporary restraining order to include Second Buyer. Seller then removed the case to the district court.

First Buyer's suit asserted the following claims: (1) breach of contract against Seller for failure to convey the Property to First Buyer, provide First Buyer with a right of first refusal, or give notice of termination to First Buyer during the Inspection Period and pay a $100,000 termination fee; (2) breach of the implied duty of good faith and fair dealing against Seller in connection with the manner in which Seller allegedly breached the 2018 Purchase Agreement; (3) promissory and equitable estoppel against Seller based on its contractual and extracontractual affirmations and representations regarding the validity and enforceability of the 2018 Purchase Agreement; (4) tortious interference against Second Buyer for allegedly knowing about First Buyer's contract but nevertheless contracting to purchase the Property and inducing Seller's breach of its contract with First Buyer; and (5) violation of the Ohio Uniform Fraudulent Transfer

Act ("UFTA") against Seller and Second Buyer regarding the manner in which the Second Buyer Contract conveyed the Property to Second Buyer. First Buyer also sought declaratory and injunctive relief with regard to the 2018 Purchase Agreement's validity and enforceability, and specific performance in connection with Seller's alleged breach.

### F. The District Court's Decision

The case ultimately proceeded to a bench trial. The district court then issued bifurcated decisions on liability and damages. The Liability Order was issued on June 7, 2021. The Damages Order was issued on December 28, 2021.

*Findings of Fact.* After considering the physical and testimonial evidence submitted at trial, the district court found that Seller ultimately "wanted to sell the Property as fast as possible for the highest price"—an understandable desire given the state of the building and the cost of its upkeep. Op., R. 111, PageID 3971. As such, Seller was concerned about First Buyer's willingness to close on the Property, given First Buyer's prior termination of the 2017 Purchase Agreement and repeated requests to extend the 2018 Purchase Agreement's Inspection Period. For its part, First Buyer "was reluctant to put hard money down until it had a clear read on the City's intentions regarding" the TIF funding, given the funding's necessity in minimizing First Buyer's risk. *Id.* at 3972. As a result, the district court was "convinced" that, if First Buyer had been tendered the right of first refusal, it would not have matched Second Buyer's terms. *Id.*

On the other hand, Seller was concerned that Second Buyer would not ultimately close on the Property because the intermediary facilitating the sale had previously brought Seller deals that failed to close. As a result, "Seller had two choices: honor the [right of first refusal] or violate the [right of first refusal]." *Id.* at 3972–73.

> With respect to violating the [right of first refusal], there were two possible
> options for Seller. First option: if Second Buyer did not close, then Seller could

8

continue to negotiate with First Buyer about the 2018 Purchase Agreement with the [$9.5 million] purchase price. Second option: if Second Buyer actually closed, then Seller would receive [$11 million] and risk being sued by First Buyer under the [right of first refusal]. Seller chose the second option as a calculated, contractual risk because the Property was, and is, rapidly deteriorating and Seller did not want to be stuck with it any longer. Seller gambled that a court would rule in its favor by finding that First Buyer's non-payment of the [escrow amount] would invalidate the 2018 Purchase Agreement.

*Id.* at 3973.

*Conclusions of Law.* The district court found that First Buyer did not materially breach the 2018 Purchase Agreement by failing to timely make the escrow payment and that First Buyer did not anticipatorily breach the Agreement by seeking extensions of the Inspection Period. The district court found that Seller materially breached the 2018 Purchase Agreement by not providing First Buyer with: (1) notice of the Second Buyer Contract, including the closing date in that contract, and (2) an opportunity to match Second Buyer's offer. The district court also found that the way Seller breached the Agreement violated its implied duty of good faith and fair dealing.[2] The court also found that Second Buyer was a bona fide purchaser of the Property and acted in good faith during the closing process, thus disallowing First Buyer's requests for specific performance and injunctive relief, and its claim of tortious interference. Lastly, the district court found that First Buyer did not fit the UFTA's definition of a "creditor" and thus lacked standing to bring a claim under the statute.

*Damages.* For the breach of contract claim, the district court awarded First Buyer $1.5 million in expectation damages, or the difference between the 2018 Purchase Agreement's purchase price ($9.5 million) and the Second Buyer Contract's purchase price ($11 million), which the court concluded was the fair market value of the Property at the time of the breach. It further

---

[2] The district court dismissed First Buyer's claim for equitable and promissory estoppel based on its rulings in favor of First Buyer for breach of contract and the implied duty of good faith and fair dealing.

awarded First Buyer $200,000 in "special damages" for the amount that First Buyer expended in connection with its normal due diligence processes and efforts to obtain TIF funding as the "reasonable and natural consequence of [Seller's] actions," which were "reasonably contemplated by [Seller] at the time of contracting." Op., R. 114, PageID 4002–03.

## II.

Because this appeal is from a judgment following a bench trial, we utilize different standards of review depending on the part of the judgment being challenged. Findings of fact are reviewed for clear error. *See Lyngaas v. Curaden AG*, 992 F.3d 412, 419 (6th Cir. 2021) (citation omitted). A district court's factual finding is "clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction' that the district court made a mistake." *United States v. Ellis*, 938 F.3d 757, 761 (6th Cir. 2019) (quoting *United States v. Vasquez*, 352 F.3d 1067, 1070 (6th Cir. 2003)). We do not decide factual issues de novo; instead, we generally defer to the trier of fact "who is usually in a superior position to appraise and weigh the evidence." *Zenith Radio Corp. v. Hazeltine Res., Inc.*, 395 U.S. 100, 123 (1969).

Questions of law are reviewed de novo. *See Lyngaas*, 992 F.3d at 419 (citation omitted). This standard of review often includes the district court's application of the law to the facts. *See Max Trucking, LLC v. Liberty Mut. Ins. Corp.*, 802 F.3d 793, 803 (6th Cir. 2015); *cf. U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 966–69 (2018).

Awards of money damages are reviewed for abuse of discretion. *See New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 402 (6th Cir. 2022). Under this standard, "[a] district court abuses its discretion when it relies on clearly erroneous findings of fact, when it improperly

applies the law, or uses an erroneous legal standard." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 218 (6th Cir. 2019).

This is a diversity case, and the parties agree that Ohio substantive law applies. *See Wilton Corp. v. Ashland Castings Corp.*, 188 F.3d 670, 673 n.2 (6th Cir. 1999) (observing that we need not conduct a choice-of-law inquiry when there is no dispute on the applicable substantive law).

**III.**

A plaintiff must prove four elements to establish an Ohio breach of contract claim: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by the breach. *See Quest Workforce Sols., L.L.C. v. Job1USA, Inc.*, 75 N.E.3d 1020, 1030 (Ohio Ct. App. 2016) (citation omitted). The parties do not contest that the 2018 Purchase Agreement was a valid and enforceable contract. As a result, we will address only the three elements that the parties dispute.

On June 1, 2018, Seller agreed to sell the Property to First Buyer for $9.5 million. As part of the purchase price, First Buyer was required to deposit $150,000 into an escrow account. First Buyer had until July 31, 2018, to investigate the Property. If the 2018 Purchase Agreement was not terminated by July 31, 2018, Seller and First Buyer agreed to close the purchase and sale of the Property by August 30, 2018. The parties raise several "breach" claims. Seller argues that First Buyer failed to perform because it did not provide a timely escrow payment and indicated immediately that it would need a longer Inspection Period. First Buyer argues that Seller breached because it did not provide First Buyer with a right of first refusal. Seller also reasserts its UFTA claim. And both sides raise arguments about the proper remedies.

**A. Whether First Buyer's Failure to Timely Make Its Escrow Payment and Stated Inability to Close on the Contracted-For Closing Date Excused Seller's Subsequent Performance**

Seller initially argues that First Buyer did not perform under the 2018 Purchase Agreement both because it failed to make a timely escrow payment and because it engaged in an anticipatory breach by indicating that it would need a longer Inspection Period.

*First Buyer's Failure to Timely Make Its Escrow Payment.* Section 2(c)(i) of the 2018 Purchase Agreement provides:

> Within five business days after the Effective Date of this Agreement Purchaser shall deposit $150,000 ("Earnest Money") into an escrow account titled jointly in the names of Michael A. Galasso (Seller's counsel) and [blank space] (Purchaser's counsel). Seller's counsel and Purchaser's counsel shall collectively serve and be referred to herein as "Escrow Agent." The signature of both Seller's counsel and Buyer's counsel shall be required for all withdrawals from the escrow account. The escrow account shall be opened and held at Huntington National Bank, or such other bank as Seller's counsel and Buyer's counsel may agree.

2018 Agreement, R. 7-4, Page ID 343. The district court found that First Buyer failed to make its escrow payment within five days of the 2018 Purchase Agreement's effective date, or at any time during the Inspection Period. That fact is undisputed.

First Buyer disputes whether this failure breached the escrow payment requirement of the Agreement, arguing that Seller prevented it from timely making its escrow payment. Additionally, First Buyer argues that, after First Buyer eventually retained counsel, Seller was unresponsive to First Buyer's attempts to finalize "a complete set of escrow terms" and that Seller never declared First Buyer in breach of the Agreement.

Ultimately, First Buyer's arguments appear to be an attempt to impose obligations on Seller that the Agreement does not require. The clause's text is clear—First Buyer was required to deposit $150,000 into a qualified escrow account within five days of the effective date of the Agreement (i.e., June 1, 2018). Apart from any efforts that the bank may have required to establish

Seller's counsel as joint holder of the account (e.g., counsel's in-person signature), the obligation was First Buyer's and First Buyer's alone.

Seller had no obligation to monitor the status of First Buyer's escrow payment or take the lead on opening the escrow account. Seller also had no obligation to review or approve First Buyer's escrow agent. By failing to timely make the escrow payment, First Buyer breached the 2018 Purchase Agreement.

The question remains whether First Buyer's failure to comply with the escrow requirement was a material breach of the 2018 Purchase Agreement that excused Seller's performance. "It is an old rule of law, as old as the law of contracts, that where one party has substantially performed his part of the contract, he may call upon the other party to perform his part of the contract; or, such party failing so to perform, he may sue for breach of contract." *Ohio Farmers' Ins. Co. v. Cochran*, 135 N.E. 537, 539 (Ohio 1922). "For the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract." *Hansel v. Creative Concrete & Masonry Constr. Co.*, 772 N.E.2d 138, 141 (Ohio Ct. App. 2002).

For example, in *Hansel*, homeowners sued a contractor for failing to finish their driveway in a workmanlike manner with proper techniques, alleging that the driveway had problems with the placement of the wire mesh and an uneven subbase. *See id.* at 141–42. Ultimately, the court found that the evidence supported the magistrate's conclusion that the contractor "substantially performed under the contract in that the driveway had not failed in its essential purpose." *Id.* at 142. Furthermore, although the homeowners in *Hansel* submitted expert testimony that the driveway had suffered significant damage after only one or two years, the same expert also testified that the concrete itself was satisfactory. The crucial linchpin in *Hansel* was that, while the homeowners "did not receive exactly what they bargained for, the driveway still met its essential

purpose. There was no testimony that the driveway was unusable or would become so in the near future. Pictures admitted at trial showed some surface defects, but the driveway was clearly useable." *Id.* at 142–43. The contractor had thus substantially performed under the contract and was entitled to be paid for that performance "less an allowance for the defects in the performance or damages for failure to strictly comply with the contract." *Id.* at 143.

Here, after the Inspection Period, the escrow payment became nonrefundable and was to be applied to the purchase price. The only substantive effect of First Buyer's failure to timely make its escrow payment was that it would need to pay that $150,000 at closing. It is unlikely that a failure to prepay 1.6% of the Agreement's purchase price "destroy[ed] the value or purpose of the contract." *Hansel*, 772 N.E.2d at 141. As a result, First Buyer's failure to timely make its escrow payment was not a material breach of the 2018 Purchase Agreement such that Seller's obligation to perform was excused.

*First Buyer's Requested Extensions of the 2018 Purchase Agreement's Inspection Period.* Apart from First Buyer's failure to timely make its escrow payment, Seller argues that First Buyer's repeated requests for extensions of the Inspection Period constituted an anticipatory breach of the 2018 Purchase Agreement such that Seller's performance was excused. "Under Ohio law, '[a] party repudiates a contract when the party insists upon terms contrary to the parties' agreement to the point where that insistence amounts to a statement of intention not to perform except on conditions which go beyond the contract.'" *Bank One, N.A. v. Echo Acceptance Corp.*, 380 F. App'x 513, 518 (6th Cir. 2010) (quoting *Mihelich v. Active Plumbing Supply Co.*, No. 90965, 2009 WL 1351031, at *3 (Ohio Ct. App. May 14, 2009) (alteration in original)). "The repudiating party must clearly and unequivocally relay its intention not to perform its contractual obligations." *Mihelich*, 2009 WL 1351031, at *3. In other words, "[a] mere request for a change

in the terms or a request for cancellation of the contract is not in itself enough to constitute a repudiation." *Id.*

Here, almost immediately after execution of the 2018 Purchase Agreement, First Buyer began requesting extensions of the Inspection Period to permit it more time to negotiate for TIF funding with the City. But, First Buyer never requested a conditional closing based on the City's timing and continued to expend resources in furtherance of its obligation to purchase the Property as dictated by the Agreement. First Buyer's requests for extensions of the Inspection Period do not rise to the level of an insistence that First Buyer would not substantially perform under the Agreement without such extensions. *See Bank One*, 380 F. App'x at 518–20. Therefore, First Buyer's requests for extensions of the Inspection Period did not constitute an anticipatory repudiation of the 2018 Purchase Agreement such that Seller was excused from performance.

**B. Whether Seller's Failure to Provide First Buyer with a Right of First Refusal Breached the 2018 Purchase Agreement**

The 2018 Purchase Agreement allowed Seller to continue marketing the Property even though it was under contract with First Buyer. But, there was a catch contained in the ROFR Amendment: "If Seller agrees to sell the Property . . . to a third party before the expiration of the Inspection Period, Seller shall provide notice of the closing to [First Buyer] and [First Buyer] may purchase the Property upon the same terms and conditions as the third party buyer's . . . ." ROFR Amendment, R. 7-5, PageID 360.

Seller argues that, under the Agreement, its duty to provide First Buyer with a right of first refusal was only triggered if a subsequent agreement with a third-party buyer had a closing date before First Buyer's Inspection Period expired on July 31, 2018. But this argument misreads the clause because it conflates two separate concepts—agreement and fulfillment. To "agree" is to "accede," "consent," or "come to an agreement with another." *Agree*, OXFORD ENGLISH

DICTIONARY (2012). Thus, by definition, nothing further is imposed on the parties after the achievement of mutual consent. Seller's obligation to provide First Buyer with a right of first refusal triggered when Seller *agreed* to sell the Property to a third party during the Inspection Period, regardless of when the closing date of that agreement was to take place. As a result, finding no clear error in the district court's factual findings that Seller failed to provide First Buyer with a right of first refusal to match Second Buyer's terms, the Court finds that Seller breached the Agreement by failing to provide the right of first refusal.

### C. Whether Seller Breached the Implied Duty of Good Faith and Fair Dealing

"In addition to a contract's express terms, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement." *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 463 (Ohio 2018). The requirement of good faith is thus a "compact reference to an implied undertaking not to take opportunistic advantage in a way that could have not been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Id.* (citation and quotation omitted). In other words, "'[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. . . . [Conversely,] [b]ad faith may consist of inaction, or may be the abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance.'" *Matus v. Lorain Cnty. Gen. Health Dist.*, 707 F. App'x 304, 312 (6th Cir. 2017) (quoting *Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (Ohio Ct. App. 2005)) (internal quotation omitted) (alteration in original).

Ohio does not recognize an independent cause of action for breach of the implied duty of good faith and fair dealing. *See Lucarell*, 97 N.E.3d at 469 (citation omitted). "Thus, there is no violation of the implied duty unless there is a breach of a specific obligation imposed by the

contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance." *Id.*

As discussed above, Seller materially breached the 2018 Purchase Agreement when it failed to provide First Buyer with notice of the closing of the sale to Second Buyer and when Seller failed to provide First Buyer with a right of first refusal to match Second Buyer's terms. The question is whether Seller's actions were sufficiently dishonest or in bad faith to violate its implied duty of good faith and fair dealing.

The 2018 Purchase Agreement permitted Seller to continue marketing the Property to prospective third-party buyers. But, if Seller agreed to sell the Property to a third party during First Buyer's Inspection Period, it had to provide First Buyer with notice of the closing and with a right of first refusal. Not only did Seller fail to satisfy its contractual obligations to First Buyer, but it also continued to work with First Buyer towards a potential closing, assuring First Buyer that the parties had a contract in place. It did so to keep First Buyer "on the hook" in case Second Buyer failed to close on the Property. Thus, Seller's failure to provide First Buyer with notice of the closing of the Second Buyer Contract and with the right of first refusal was less accidental omission and more purposeful concealment to inure to Seller's financial benefit. Seller's conduct falls within the type of bad faith inaction that rises to the level of violating the implied duty of good faith and fair dealing. As such, the district court did not err in finding that Seller violated its implied duty of good faith and fair dealing.

### D. The Applicability of the UFTA to the Second Buyer Contract

First Buyer's UFTA claims arise under Ohio Revised Code §§ 1336.04(A) and 1336.05(A). Section 1336.04(A) provides that a fraudulent transfer occurs as to a creditor if the debtor made the transfer or incurred the obligation in either of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; [or]

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies: (a) [t]he debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction [or] (b) [t]he debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Similarly, § 1336.05(A) also requires that First Buyer show that Seller's transfer of the Property under the Second Buyer Contract was made "without receiving a reasonably equivalent value in exchange for the transfer . . . ."

First Buyer argues that the district court erred by finding that First Buyer was not a "creditor" under the UFTA and, further, that the Second Buyer Contract involved a fraudulent transfer when Seller conveyed the Property to an LLC to avoid certain Ohio transfer taxes. The question is thus whether First Buyer qualifies as a "creditor" under the UFTA and subsequently whether it can sustain a claim under § 1336.04(A) or 1336.05(A).

The UFTA defines a "creditor" as "a person who has a claim," with a "claim" being defined as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Ohio Rev. Code Ann. § 1336.01(C)–(D). The Supreme Court of Ohio has interpreted "creditor" to encompass individuals with causes of action in tort. *See Stein v. Brown*, 480 N.E.2d 1121, 1123–24 (Ohio 1985). The tort claimant would then become a creditor "at the moment in which the cause of action accrues." *Id.* Under an earlier version of this statute defining a creditor as a person having "any claim," moreover, Ohio courts recognized that creditors include "all persons having a valid cause of action arising from torts as well as from *contracts*." *Foster v. Gibson*, 202 N.E.2d 202, 204 (Ohio Ct. App. 1964) (emphasis added).

As First Buyer correctly points out, there appears to be no precedent under the current statutory language differentiating contract claims from tort claims to determine whether a claimant

is a "creditor" under the UFTA. Therefore, we find that First Buyer established that it is a "creditor" under the UFTA and has standing to sue under §§ 1336.04(A) and 1336.05(A). That said, based on the record, we find as a matter of law that First Buyer did not prove that Seller violated the UFTA under either § 1336.04(A) or § 1336.05(A).

Section 1336.04(A)(1) required First Buyer to prove that Seller transferred the Property to an LLC under the Second Buyer Contract with "actual intent to hinder, delay, or defraud" First Buyer in connection with the supposed creditor-debtor relationship. First Buyer argues that it sufficiently showed that "Seller was aware of its contract with First Buyer and its obligations thereunder, including its obligation to offer a right of first refusal" and that Seller "intentionally, secretly, and maliciously transferred the Property to [Second Buyer] as part of the closing with Second Buyer." Appellee's Br. at 51–52. This argument appears to fail by its own terms. Seller transferred the Property under the Second Buyer Contract as part of the closing with Second Buyer, not as an attempt to avoid paying First Buyer on its "claim" (i.e., the breach of contract action). Even assuming that the claim for the breach of the right of first refusal arose prior to closing, the district court found that Seller received funds from Second Buyer corresponding to the Property's value in an arms-length deal. *See* Ohio Rev. Code § 1336.04(B). Because § 1336.04(A) requires a transfer to be "fraudulent as to a creditor," the evidence does not support First Buyer's claim that Seller transferred the Property pursuant to the Second Buyer Contract to avoid paying damages to First Buyer in connection with its breach of contract claim.

Section 1336.04(A)(2) required First Buyer to prove that Seller transferred the Property pursuant to the Second Buyer Contract "[w]ithout receiving a reasonably equivalent value in exchange for the transfer . . . ." First Buyer argues that the facts are "undisputed that Seller transferred the Property to its affiliate for no consideration," and then Second Buyer purchased the

membership interests of that affiliate. It is slightly disingenuous for First Buyer to argue that the sales arrangement created by the Second Buyer Contract was a fraudulent conveyance when the 2018 Purchase Agreement's conveyance structure almost completely mirrors that of the Second Buyer Contract. Nevertheless, looking at the Second Buyer Contract as a whole, the facts do not support First Buyer's argument that Seller conveyed the Property pursuant to the Second Buyer Contract for "no consideration." While the Second Buyer Contract required Seller to convey the Property to an LLC as a "capital contribution" for no compensation, the Contract also required Second Buyer to purchase 100% of the LLC's membership interests from Seller on the date of the closing for $11 million. Thus, looking at the transfer structure as a whole, the facts indicate that Seller transferred the Property pursuant to the Second Buyer Contract in exchange for $11 million. *Cf. Columbus City Schs. Bd. of Educ. v. Franklin Cnty. Bd. of Revision*, 150 N.E.3d 877, 881, 886 (Ohio 2020). As a result, the facts do not support the claim that Seller's receipt of millions of dollars was not a "reasonably equivalent value in exchange for the transfer . . . ." § 1336.04(A)(2).

And for the same reasons that First Buyer's claim under § 1336.04(A)(2) fails, its claim under § 1336.05(A) must also fail because the section similarly required First Buyer to show that Seller's transfer of the Property under the Second Buyer Contract was made "without receiving a reasonably equivalent value in exchange for the transfer . . . ." § 1336.05(A). All told, First Buyer failed to prove that Seller violated the UFTA.

**E. Remedies**

First Buyer argues that the district court erred by denying it specific performance under the UFTA, namely, transfer of the Property from Second Buyer to First Buyer. Seller argues that specific performance is not warranted and that the district court erred in calculating its damages award because (1) the district court's expectation damages award was improperly calculated,

(2) the district court failed to follow the 2018 Purchase Agreement's liquidated damages provision, which permitted an award of no more than $100,000, and (3) the district court's special damages award of $200,000 was not supported by credible evidence. We conclude that First Buyer cannot obtain specific performance and that it was entitled to only $100,000 damages—whether we calculate those damages using an "expectation" or "reliance" measure.

1. *Specific Performance.* First Buyer initially argues that it would be entitled to specific performance and an unwinding of the sale to Second Buyer if its claim under the UFTA succeeded. Because this claim fails, we need not consider this requested remedy for the UFTA violation.

2. *Damages.* That fact leaves First Buyer with a potential damages award. "[T]he sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach[.]" *Infinity Cap. LLC v. Francis David Corp.*, 851 F. App'x 579, 590–91 (6th Cir. 2021) (quoting *Lake Ridge Acad. v. Carney*, 613 N.E.2d 183, 187 (Ohio 1993)) (alteration in original). These damages generally serve to protect the non-breaching party's *expectation* interest ("i.e., its interest in having the benefit of the bargain" by being put in as good of a position as it would have been in had the contract been performed) or the party's *reliance* interest ("i.e., its interest in being reimbursed for loss caused by reliance on the contract" by being put in as good of a position as it would have been in had the contract not been made). *Father's House Int'l, Inc. v. Kurguz*, 71 N.E.3d 711, 718 (Ohio Ct. App. 2016) (quoting *Alts. Unlimited-Special, Inc. v. Ohio Dep't of Educ.*, No. 12AP-647, 2013 WL 4807016, at *6 (Ohio Ct. App. Sept. 10, 2013)); *see* Restatement (Second) of Contracts § 344 (Am. L. Inst. 1981). "Expectation damages and reliance damages are fundamentally different: '[t]he expectancy recovery affirms the existence of a contract; the reliance recovery tries to deny it.'" *Father's House*, 71 N.E.3d at 718 (quoting *Alts. Unlimited-Special*, 2013 WL 4807016, at *6). Under standard principles of contract law, a party

has the option to choose either its expectation damages or its reliance damages.  But it cannot recover both types of damages.  *See id.* at 718–19; Restatement (Second) of Contracts §§ 344–45.

In this case, the district court awarded First Buyer $1.5 million in "expectation" damages and $200,000 in "special" damages.  Its award rested on two mistakes.  The court used an improper calculation to measure expectation damages.  It also treated reliance damages as special damages and so improperly allowed First Buyer to recover both expectation and reliance damages.

*Expectation Damages*. When a court does not order specific performance for a conventional breach of a real estate agreement, the traditional damages award is expectation damages, measured by "the difference between the original contract price and the fair market value of the property at the time of the breach."  *Kaufman v. Byers*, 823 N.E.2d 530, 539 (Ohio Ct. App. 2004) (quotation omitted).  For fair market value, "[i]t has been held that when the sale of real estate after a breach of contract is made within a reasonable time and at the highest price obtainable after the breach, it is evidence of the market value on the date of the breach."  *Triangle Props., Inc. v. Homewood Corp.*, 3 N.E.3d 241, 254 (Ohio Ct. App. 2013) (citing *Roesch v. Bray*, 545 N.E.2d 1301, 1303 (Ohio Ct. App. 1988)); *see Spalla v. Fransen*, 936 N.E.2d 552, 557 (Ohio Ct. App. 2010) (same).  The district court relied on this traditional number.  First Buyer agreed to buy the Property for $9.5 million and Seller sold it to Second Buyer for $11 million.  The court thus awarded the difference: $1.5 million.

But this case does not involve a conventional breach.  The district court held that Seller breached a unique provision of the real-estate contract: the right of first refusal.  When a contract has this type of provision and the seller communicates a second offer to the holder of the first-refusal right, those terms override any terms that the right holder may have originally obtained. *See generally* 3 Corbin on Contracts § 11.3 (2022 ed.).  The holder of the first-refusal right "has a

privilege, without the obligation, to purchase real property at a price determined by an offer by a third party within an agreed upon period of time following notice of such third party's offer." *Loeffler v. Crosser*, No. OT-98-034, 1999 WL 375525, at *3 (Ohio Ct. App. June 11, 1999) (citing 4 Robert M. Curry & James Geoffrey Durham, Ohio Real Property Law and Practice § 1-1(e) (5th ed. 1996)).

When a party has breached a right of first refusal, expectation damages accordingly must reflect the *third-party offer*, not the *original* price, in order to put the victim of the breach in as good of a position as if it had been able to exercise its first-refusal right. Otherwise, the holder of the first-refusal right would receive a windfall by basing damages on a lower price that was no longer available to that party. *See Koch Indus., Inc. v. Sun Co., Inc.*, 918 F.2d 1203, 1214 (5th Cir. 1990); *Pantry Pride Enters., Inc. v. Stop & Shop Cos., Inc.*, 806 F.2d 1227, 1231 (4th Cir. 1986); *see also Abdallah v. Abdallah*, 359 F.2d 170, 173 (3d Cir. 1966) (collecting authorities). And if a buyer showed no interest in purchasing that property at the third-party price, the buyer cannot obtain expectation damages for breach of a right that it would not have exercised. *Cf. Christiansen v. Schuhart*, 951 N.E.2d 107, 114–15 (Ohio Ct. App. 2011); *Treinen v. Kollasch-Schlueter*, 902 N.E.2d 998, 999–1002 (Ohio Ct. App. 2008); *see also Koch Indus.*, 918 F.2d at 1214–15.

That is the case here. The district court was "convinced" (and found as a fact) that First Buyer would not have matched the $11 million purchase price offered by Second Buyer. Op., R. 111, PageID 3972. Thus, First Buyer would have declined to exercise its right to purchase the Property at the higher price under the right of first refusal. If Seller had properly given notice of Second Buyer's offer and First Buyer had declined to exercise its right of first refusal (as the district court found it would), what would have been First Buyer's expectation? The ROFR Amendment leaves the answer to this question clear: "Purchaser's right of first refusal shall

terminate, and Seller may terminate the Purchase Contract in accordance with section 3 below."

ROFR Amendment, R. 7-5, PageID 360. Sections 3 and 4 of the amendment then provide:

> **3. RIGHT TO TERMINATE:** Seller may terminate the Purchase Contract at any time during the Inspection Period, by providing Purchaser with written notice of termination (the "Termination Notice"). Within ten days of Seller's delivery of the [notice], Seller shall pay $100,000 to Purchaser (the "Termination Fee").
>
> **4. TERMINATION FEE:** The Termination Fee shall serve as liquidated damages under the Purchase Contract, and shall be Purchaser's sole remedy for Seller's failure to perform under the Purchase Contract. Upon Seller's payment of the Termination Fee, Purchaser shall have no further rights or claims of any kind against Seller, and Purchaser shall have waived all remedies for Seller's breach of the Purchase Contract, including, without limitation, specific performance.

*Id.* Under these terms, First Buyer would have received only the $100,000 fee if Seller had not breached the ROFR Amendment by failing to give it the right of first refusal. We therefore hold that First Buyer was entitled to $100,000 in expectation damages, the amount that would put it in as good of a position as if Seller had presented First Buyer with Second Buyer's offer, First Buyer had declined, and Seller had terminated the agreement and paid the Termination Fee.

In response, First Buyer invokes a different theory about the terms that Seller "breached." First Buyer argues that the 2018 Purchase Agreement obligated Seller to sell the Property to First Buyer for $9.5 million once the Inspection Period ended regardless of the right of first refusal. According to this theory of breach, once the time to notify First Buyer of another sale had expired, Seller's right to sell the Property to Second Buyer also expired, and the contract required Seller to close on the sale to First Buyer at the original $9.5 million price. This theory of breach has several problems. To begin with, the theory made its first appearance during our questioning at oral argument. Because First Buyer did not brief this breach theory, it has forfeited the argument. *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–13 (6th Cir. 2022).

In any event, the district court's conclusions do not support this theory. The district court found that Seller breached the agreement because it "did not provide First Buyer notice of the

Second Buyer Contract's existence" and "did not provide First Buyer with the opportunity to purchase the Property under the same terms and conditions as found in the Second Buyer Contract." Op., R. 111, PageID 3977. In its damages order, the district court similarly noted that the breach occurred "by failing to offer First Buyer its [right of first refusal]." Op., R. 114, PageID 3999. The court did not find that First Buyer and Seller were locked into a contract to transact the property at the original price after the close of the Inspection Period. Nor did it make findings that would have supported First Buyer's theory of breach, such as that First Buyer would have been willing and able to purchase the Property for $9.5 million by August 30, 2018. This theory thus cannot save the district court's $1.5 million expectation damages award. That award is an improper windfall.

"*Special" Damages.* Apart from expectation damages, the district court awarded First Buyer $200,000 to reimburse its due diligence costs. First Buyer argues that it can recover these costs in addition to its expectation damages because they are "special damages." We disagree.

These due diligence damages seek to protect First Buyer's "reliance interest, i.e., its interest in being reimbursed for loss caused by reliance on the contract." *Alts. Unlimited-Special*, 2013 WL 4807016, at *6. In that respect, First Buyer would have engaged in these same due diligence practices even if Seller had offered it the right of first refusal. *See* Op., R. 111, PageID 3958, 3967. Indeed, First Buyer incurred these expenses while it believed the contract was still in effect, not after learning of the breach. *Cf. Sharp v. Andisman*, Nos. 24999, 25002, 2010 WL 3676865, at *8–9 (Ohio Ct. App. Sept. 22, 2010). As a result, these expenses formed "a part of the expected cost of the transaction" that First Buyer presumably believed it would recoup through profitable operation of the property. *Callahan v. Richardson,* No. C-780119, 1979 WL 208683, at *2 (Ohio Ct. App. Apr. 4, 1979) (per curiam) (quotation omitted). As a matter of law, however, First Buyer

25

could not recover both expectation damages and reliance damages. *See Father's House*, 71 N.E.3d at 718–19.

Nor can First Buyer sidestep this black-letter limitation on the proper relief by relabeling its "reliance" damages as "special" damages. What Ohio has sometimes called "special" damages are what we more commonly today call "consequential" damages. *See* 24 Williston on Contracts § 64:16 (4th ed. 2022); Restatement (Second) of Contracts § 351 cmt. b; *cf. MacDonald v. Authentic Invests., L.L.C.*, No. 15AP-801, 2016 WL 3522193, at *8–9 (Ohio Ct. App. June 28, 2016); *Cleveland Punch & Shear Works Co. v. Consumers' Carbon Co.*, 5 Ohio C.C. (n.s.) 258 (1904). Consequential damages are a special form of expectation damages that correspond not to the direct loss of the bargained-for promise but the foreseeable consequences that proximately result from the breach. *See* 24 Williston on Contracts § 64:16; Restatement (Second) of Contracts § 351. In other words, special damages allow a party to recover certain costs that a party has suffered *because of* that breach; they do not allow the recovery of expenses that would have been borne *even without the breach*. *See MacDonald*, 2016 WL 3522193, at *9; *Callahan*, 1979 WL 208683, at *2; *see also* 30 Ohio Jur. (Third) Damages § 20 (2022) (discussing the elements of special damages). In this case, the district court denied First Buyer's request for special damages (without labeling them as such) when it held that its request for lost profits were "too remote and speculative." Op., R. 114, PageID 4003.

In contrast to these types of consequential damages, Ohio case law makes it clear that due diligence costs that a party would have incurred even if the other side had not breached do not qualify as special damages in the real estate context. For instance, a party may receive special damages for the costs of removing a cloud on title caused by the breach, *see Moorman v. Levitch*, 26 Ohio N.P. (n.s.) 540, 545–46 (Ohio C.P. Hamilton Cnty. 1927), but not the expenses of

procuring the "certificate of title . . . in anticipation of the contract being fulfilled," *Dudock v. Alexander*, 1928 WL 2508, at *2 (Ohio Ct. App. 1928). The sellers of real estate may be able to recover for additional costs of insurance and utilities needed "for the preservation of the property" pending another sale if the breach had caused these costs because the sellers had moved out because of the contract, *Callahan*, 1979 WL 208683, at *3, but not if they had vacated that property before putting it up for sale and so demonstrated that those costs were incidental to their continued ownership, *see Sharp*, 2010 WL 3676865, at *8–9 (citing *Peterman v. Dimoski*, No. C-020116, 2002 WL 31894859, at *4 (Ohio Ct. App. Dec. 31, 2002)); *Hiatt v. Giles*, No. 1662, 2005 WL 3346172, at *8 (Ohio Ct. App. Dec. 9, 2005). And while sellers can recover for the costs of hiring a broker to relist a home following the breach in order to mitigate damages, *see Callahan*, 1979 WL 208683, at *3, special damages remain unavailable when the seller engaged that broker to arrange the initial sale, *see Czerniak v. Aziz*, 2011 WL 2535584, at *8 (Ohio Ct. App. June 24, 2011). First Buyer's due diligence expenditures in this case fall on the wrong side of this divide. It would have incurred those costs even if Seller had not breached and so the costs qualify as "reliance" damages rather than "special" damages.

To be sure, First Buyer could choose the larger of its expectation damages (which, under the proper calculation, were $100,000) and its reliance damages (which the district court calculated as $200,000). Yet the district court legally erred in another way by finding First Buyer entitled to recover all of its $200,000 in alleged reliance expenditures. Recall that under § 4 of the ROFR Amendment, First Buyer's "sole remedy for Seller's failure to perform under the Purchase Contract" was $100,000 in "liquidated damages." ROFR Amendment, R. 7-5, PageID 360. Businesses commonly include such "breakup fees" in their contracts to assure potential buyers that they will be able to recover the costs that they expended in reliance on the deal coming to fruition

27

in the event the deal does not go through. *Cf. Frazier Indus., L.L.C. v. Gen. Fasteners Co*., 137 F. App'x 723, 727–28, 733–34 (6th Cir. 2005); *Edelman v. Fruehauf Corp.*, 798 F.2d 882, 885 (6th Cir. 1986); *Sunde v. Highline Corp.*, No. 19337, 1999 WL 635727, at \*3 (Ohio Ct. App. Aug. 18, 1999).

The $100,000 Termination Fee serves that same function. *Cf.* Restatement (Second) of Contracts § 349. As the district court found, the parties intended that this fee would suffice "to cover the expenses that First Buyer would incur performing its due diligence and working to secure incentives from the City." Op., R. 111, PageID 3958 n.8. First Buyer also does not claim that the Termination Fee is an unenforceable penalty clause instead of a legitimate liquidated damages provision, such as might occur if $100,000 was an unreasonably small estimate of anticipated expenditures. *See* Restatement (Second) of Contracts, § 356; *see also Infinity Cap.*, 851 F. App'x at 583–84; *cf. Frazier Indus.*, 137 F. App'x at 735. Under § 4's Termination Fee, therefore, First Buyer can receive only $100,000 in reliance damages for its due diligence costs.

In response, First Buyer says that § 4's limitation on the amount of damages should not apply to Seller's breach in this case. Section 11(b) of the 2018 Purchase Agreement provided other remedies that First Buyer could seek upon Seller's breach of the Agreement:

> If the Closing is not concluded due to Seller's breach of this Agreement, Purchaser, at its option, (a) may elect to enforce the terms hereof by action for specific performance, and/or exercise any other right or remedy available to it at law or in equity, or (b) may terminate this Agreement by notice to Seller and receive a full refund of the Earnest Money plus reimbursement from Seller for Purchaser's out of pocket costs incurred investigating the Property in an amount not to exceed [$50,000]. Upon any termination under (b) above, the parties shall have no further rights and obligations hereunder other than those rights and/or obligations which are expressly stated to survive expiration or termination of this Agreement.

2018 Agreement, R. 7-4, PageID 347. According to First Buyer, this provision, not § 4 of the ROFR Amendment, applied to Seller's breach and gave it a right to seek $200,000 in reliance

damages. Yet it limited due-diligence costs to an even smaller number: $50,000. Regardless, we do not think that this provision applied here.

At first glance, there appears to be a conflict between § 11(b) of the 2018 Purchase Agreement and § 4 of the ROFR Amendment. How could § 11(b) serve as a basis for damages when § 4 of the ROFR Amendment states that the Termination Fee is First Buyer's "sole remedy for Seller's failure to perform"? While an amendment generally supersedes a contract's prior terms, "construction of the contract should attempt to harmonize all the provisions rather than produce conflict in them. . . . To that end, no provision of the contract should be ignored as inconsistent if there exists a reasonable interpretation [that] gives effect to both." *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 685 (6th Cir. 2000) (quoting *Ottery v. Bland*, 536 N.E.2d 651, 654 (Ohio Ct. App. 1987)).

But we interpret § 4's Termination Fee as serving as First Buyer's "sole remedy" whenever Seller breached the termination procedure of the ROFR Amendment. Section 4 provides First Buyer with this remedy "for Seller's *failure to perform* under the Purchase Contract" and states that Purchaser waives all other remedies for "Seller's *breach* of the Purchase Contract[.]" ROFR Amendment, R. 7-5, PageID 360 (emphasis added). Because § 3 of the ROFR Amendment grants Seller the option of selling the property to someone else, and because First Buyer acknowledged in the Purchase Agreement that Seller could continue to market the property until closing, no breach would occur simply because Seller chose another offer and properly gave First Buyer timely notice of termination. Thus, § 4 must contemplate a situation *other* than when Seller gave notice of termination of the contract during the Inspection Period. Instead, the same termination fee as owed under § 3 would serve as First Buyer's sole remedy when Seller sold the property to another buyer without offering First Buyer its right of first refusal (in breach of § 2 of the ROFR

29

Amendment) or providing notice (in breach of § 3). If Seller never agreed to sell to another purchaser, by contrast, § 3's termination requirements would not arise, and absent a need for termination, First Buyer would not be entitled to a *Termination* Fee as its sole remedy. In that case, Section 11(b) would continue to govern First Buyer's remedies, as Seller's conduct had not implicated the right of first refusal.

First Buyer rejects this reading as absurd by suggesting that Seller could profit from its breach by paying First Buyer $100,000 while retaining the $150,000 deposited into escrow. That speculation (First Buyer does not claim that Seller retained the $150,000) misstates the mechanics of escrow. In an escrow agreement, a grantor places property with a depository, who is both an agent for the parties and a trustee of the property pursuant to the escrow agreement. *Squire v. Branciforti*, 2 N.E.2d 878, 882 (Ohio 1936); *Standard Asbestos Mfg. Co. v. Fulton*, 4 N.E.2d 713, 715 (Ohio Ct. App. 1935). Even though delivery of the property is irrevocable and the transferee obtains some conditional rights in that property, the grantor retains ownership of the property until the escrow conditions are satisfied. *In re Arctic Exp. Inc.*, 636 F.3d 781, 792 (6th Cir. 2011); *Lloyd's Lessee v. Giddings*, 7 Ohio 50, 53 (1836); *Bank Street Bldg. Ass'n v. Schnell*, 29 Ohio N.P. (n.s.) 579, 581 (Ohio C.P. Hamilton Cnty. 1932). The escrow agent accordingly can disperse property held in escrow only as the contract of deposit permits. *Waffen v. Summers*, No. OT-08-34, 2009 WL 1741731, at *5 (Ohio Ct. App. June 19, 2009). The 2018 Purchase Agreement gave Seller the right to retain First Buyer's earnest money only if closing occurred or First Buyer breached the agreement. 2018 Agreement, R. 7-4, PageID 343, 347. The escrow agent accordingly would be obligated to return the earnest money to First Buyer whenever Seller prevented First Buyer from closing on the Property, even if Seller did not breach the right of first refusal in the process. *See* Escrow Agreement, R. 7-7, PageID 392–94. If Seller refused to consent

to returning the earnest money, the escrow agent could then bring an interpleader action that would result in the money being returned to First Buyer without First Buyer ever having to seek a "remedy" against Seller directly for the $150,000 under the 2018 Purchase Agreement. *Id.* at 394.

In sum, because of the way § 4 of the ROFR Amendment operates, First Buyer's expectation and reliance damages both equal $100,000. We therefore hold that the district court erred by awarding First Buyer damages greater than $100,000.

## IV.

For the aforementioned reasons, we **AFFIRM** the district court's judgment regarding the respective liabilities of the parties. But we **REVERSE** its damages award to First Buyer and **REMAND** with instructions to reduce that award from $1.7 million to $100,000.

**MATHIS, Circuit Judge, concurring in part and dissenting in part.** I concur in the majority opinion, except as to the expectation damages analysis in Section III.E. I agree with the majority that the district court did not err in its liability determinations. I further agree that the award of expectation damages to First Buyer should be reduced, just not by as much as determined by the majority opinion. For the reasons below, I would reduce the expectation damages awarded by the district court to First Buyer to $900,000 rather than $100,000.

I.

To briefly recap, on June 1, 2018, Seller entered into the 2018 Purchase Agreement to sell the Property to First Buyer for $9.5 million. Seller and First Buyer also executed the ROFR Amendment, which amended and became part of the 2018 Purchase Agreement. The 2018 Purchase Agreement allowed First Buyer to inspect and investigate the Property up to July 31, 2018. Seller and First Buyer were required to close on the Property no later than August 30, 2018. First Buyer was unable to purchase the Property from Seller because Seller secretly sold the Property to Second Buyer on August 1, 2018, the day after the 2018 Purchase Agreement's Inspection Period concluded. Thus, Seller materially breached the 2018 Purchase Agreement, and its duty of good faith and fair dealing, when it sold the Property to Second Buyer without complying with the ROFR Amendment.

II.

Under Ohio law, "[i]n all cases involving contract interpretation, [courts] start with the primary interpretive rule that courts should give effect to the intentions of the parties as expressed in the language of their written agreement." *Sutton Bank v. Progressive Polymers, L.L.C.*, 163 N.E.3d 546, 552 (Ohio 2020) (citation omitted). In doing so, "common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results or unless

some other meaning is clearly intended from the face or the overall contents of the instrument."

*Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978); *see Sutton Bank*, 163

N.E.3d at 552.

There are several provisions in the 2018 Purchase Agreement and ROFR Amendment that

address the remedies First Buyer can seek upon Seller's breach, or termination, of the Agreement.

Section 11(b) of the 2018 Purchase Agreement provides:

> If the Closing is not concluded due to Seller's breach of this Agreement, Purchaser, at its option, (a) may elect to enforce the terms hereof by action for specific performance, and/or exercise any other right or remedy available to it at law or in equity, or (b) may terminate this Agreement by notice to Seller and receive a full refund of the Earnest Money plus reimbursement from Seller for Purchaser's out of pocket costs incurred investigating the Property in an amount not to exceed [$50,000].  Upon any termination under (b) above, the parties shall have no further rights and obligations hereunder other than those rights and/or obligations which are expressly stated to survive expiration or termination of this Agreement.

[R. 7-4, PageID 347].  Sections 3 and 4 of the ROFR Amendment contain additional language

regarding First Buyer's remedies to Seller's breach of the 2018 Purchase Agreement:

> **3.  RIGHT TO TERMINATE:** Seller may terminate the Purchase Contract at any time during the Inspection Period, by providing Purchaser with written notice of termination (the "Termination Notice").  Within ten days of Seller's delivery of the [notice], Seller shall pay $100,000 to Purchaser (the "Termination Fee").
>
> **4.  TERMINATION FEE:** The Termination Fee shall serve as liquidated damages under the Purchase Contract, and shall be Purchaser's sole remedy for Seller's failure to perform under the Purchase Contract.  Upon Seller's payment of the Termination Fee, Purchaser shall have no further rights or claims of any kind against Seller, and Purchaser shall have waived all remedies for Seller's breach of the Purchaser Contract, including, without limitation, specific performance.

[R. 7-5, PageID 361].

At first glance, there appears to be a conflict between § 11(b) of the 2018 Purchase Agreement and § 4 of the ROFR Amendment. How could § 11(b) serve as a basis for damages when § 4 of the ROFR Amendment states that the Termination Fee is First Buyer's "sole remedy for Seller's failure to perform"?

While an amendment generally supersedes a contract's prior terms, "'construction of the contract should attempt to harmonize all the provisions rather than produce conflict in them. . . . To that end, no provision of the contract should be ignored as inconsistent if there exists a reasonable interpretation [that] gives effect to both.'" *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 685 (6th Cir. 2000) (quoting *Ottery v. Bland*, 536 N.E.2d 651, 654 (Ohio Ct. App. 1987)). A literal interpretation of § 4 of the ROFR Amendment fails to give effect to all provisions of the 2018 Purchase Agreement in a manner that expresses the reasonable expectations of the parties.

Section 4 of the ROFR Amendment should be interpreted to only foreclose First Buyer from obtaining remedies against Seller beyond the Termination Fee *solely* for exercising its right to terminate the 2018 Purchase Agreement during the Inspection Period. In other words, First Buyer cannot seek specific performance, reliance damages, or other equitable remedies from Seller simply because Seller exercised its contractual right to back out of the deal. Section 4 does not encompass other breaches of the Agreement, nor Seller's attempt to terminate the Agreement after the Inspection Period.

Section 4 of the ROFR Amendment was not triggered in this case. Seller purported to terminate the 2018 Purchase Agreement nine days *after* the close of the Inspection Period. Furthermore, when it purported to terminate the Agreement, Seller failed to pay First Buyer the Termination Fee within 10 days of providing notice of termination. By its own terms, § 4 does

not apply. As a result, the liquidated damages provision in § 4 does not limit the amount of damages First Buyer can recover damages from Seller.

Seller argues that § 4 should be read literally and that under such a reading, § 4 "is First Buyer's sole remedy and damages for any breach of the [A]greement by Seller." [D. 21 at p.27]. Looking at the plain language of § 4, it appears to limit First Buyer's damages to the $100,000 Termination Fee for any claims in connection with Seller's breach. Thus, because "the additional terms supersede the original terms to the extent the two are contradictory," Seller appears correct that, under a literal reading, First Buyer was entitled to $100,000 in damages and nothing more. *Ottery*, 536 N.E.2d at 654. But there are two reasons why a literal reading of § 4 leads to "manifest absurdity" in the interpretation of the 2018 Purchase Agreement. *Alexander*, 374 N.E.2d at 150.

First, in its briefing, First Buyer raises a compelling counterargument to Seller's rigid interpretation of § 4: "Under Seller's interpretation, Seller could theoretically keep First Buyer's $150,000 [escrow payment] and pay out only $100,000 as liquidated damages," producing a financial windfall for Seller. [D. 22 at p.43]. Such an arrangement appears to give Seller all the upside and leave First Buyer with all the risk. Ultimately, it is highly unlikely that the parties would have negotiated for such a result. As such, another meaning appears "clearly intended from the face or the overall context of the instrument." *Alexander*, 374 N.E.2d at 150.

Second, putting aside § 4's effect on the other relevant damages provisions, a literal reading of § 4's extent appears similarly misguided. Pursuant to § 3 of the ROFR Amendment, Seller can terminate the 2018 Purchase Agreement by providing written notice of termination during the Inspection Period and paying First Buyer the $100,000 Termination Fee within ten days of the notice. If Seller fails to fulfill either requirement, the termination is void. But if one looks solely at § 4, it appears that Seller could simply breach the 2018 Purchase Agreement for any reason and

still only be required to pay $100,000. Why, then, would Seller ever choose to properly terminate the Agreement during the Inspection Period and immediately pay $100,000 when it could breach the Agreement at a later time and still only have to pay the same $100,000 years down the line?

An interpretation of § 4 that would permit the above scenario appears to fall under the exception for giving words their common meaning "unless manifest absurdity results." *Alexander*, 374 N.E.2d at 150. Of course, § 4 directly follows § 3 in the ROFR Amendment. It would be absurd to conclude that the Termination Fee is highly conditioned in one paragraph and nearly unconditioned in the next, especially when the later paragraph subsumes the circumstances outlined in the former. *See id.* The question then turns to what the proper amount of expectation damages should be in this case.

### III.

"[T]he sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach[.]" *Infinity Cap. LLC v. Francis David Corp.*, 851 F. App'x 579, 590–91 (6th Cir. 2021) (quoting *Lake Ridge Acad. v. Carney*, 613 N.E.2d 183, 187 (Ohio 1993)) (alteration in original). In breaches of real estate agreements, the traditional damages award is expectation damages, measured by "the difference between the original contract price and the fair market value of the property at the time of the breach." *Kaufman v. Byers*, 823 N.E.2d 530, 539 (Ohio Ct. App. 2004) (quotation omitted). In determining fair market value, "[i]t has been held that when the sale of real estate after a breach of contract is made within a reasonable time and at the highest price obtainable after the breach, it is evidence of the market value on the date of the breach." *Triangle Props., Inc. v. Homewood Corp.*, 3 N.E.3d 241, 254 (Ohio Ct. App. 2013) (citing *Roesch v. Bray*, 545 N.E.2d 1301, 1303 (Ohio Ct. App. 1988)); *see Spalla v. Fransen*, 936 N.E.2d 552, 557 (Ohio Ct. App. 2010) (same).

The Property's sale to Second Buyer took place on August 1, 2018, shortly after Seller breached the 2018 Purchase Agreement. This led the district court to use the price difference between the 2018 Purchase Agreement ($9.5 million) and the Second Buyer Contract ($11 million) as the measure of First Buyer's expectation damages. This was incorrect.

The district court found that Seller sold the Property to Second Buyer for $10.4 million. Thus, "the highest price obtainable after the breach" was $10.4 million, not $11 million. *Triangle Props.*, 3 N.E.3d at 254. *Spalla* is instructive on this point. In *Spalla*, the parties disputed whether the highest obtainable price for a real estate sale was the purchase agreement's contract price or the amount the buyer actually paid for the property. *See Spalla*, 936 N.E.2d at 557. Specifically, the purchase agreement stipulated that $15,000 of the sale proceeds would be held in escrow in case the property's septic tank failed to pass inspection and needed repair. *Id.* at 558. The septic tank ultimately failed its inspection and the court determined that this condition reduced the property's highest obtainable price by $15,000. *Id.* In other words, the focus was on how much the buyer actually paid from the sale of the property, not the purchase price in the purchase agreement. *See id.*

While it was not an abuse of discretion for the district court to award First Buyer the traditional measure of damages for breaches of real estate agreements (i.e., expectation damages), the district court erred when it found that the Second Buyer Contract price ($11 million) was the fair market value for the Property rather than the actual purchase price ($10.4 million). *See Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 218 (6th Cir. 2019) ("A district court abuses its discretion when it . . . improperly applies the law[.]") (quotation omitted). Therefore, the proper expectation damages award to First Buyer should have been $900,000, not $1.5 million. This amount would put First Buyer in the position it would have been had the 2018 Purchase Agreement

been performed—i.e., if Seller had sold the Property to First Buyer for $9.5 million as it was required to do when it, instead, sold the Property to Second Buyer. *See Father's House Int'l, Inc. v. Kurguz*, 71 N.E.3d 711, 718 (Ohio. Ct. App. 2016) (citation omitted).

The majority opinion limits First Buyer's expectation damages to the $100,000 Termination Fee in the ROFR Amendment because "[t]he district court was 'convinced' . . . that First Buyer would not have matched the $11 million purchase price offered by Second Buyer." [Op. at 23]. There are a couple of problems with this reasoning. First, the district court expressly found that its belief that First Buyer would not have matched the purchase price in the Second Buyer Agreement was "hypothetical" and "irrelevant." [R. 111, PageID 3972]. And second, when Seller sold the Property to Second Buyer on August 1, 2018, the termination terms of the ROFR Amendment no longer applied. To limit First Buyer's damages to $100,000, Seller had to terminate the 2018 Purchase Agreement on or before July 31, 2018, and pay the Termination Fee to First Buyer within 10 days of the termination. As the district court found, Seller did not attempt to terminate the 2018 Purchase Agreement until August 9, 2018, and it never paid the Termination Fee.

I respectfully dissent from the expectation damages analysis in Section III.E of the majority opinion.